THE CITY OF CHICAGO, Plaintiff in Error, *v.* JOHN EVANS *et al.*, Defendants in Error.

### ERROR TO COOK.

The act of twelfth February, 1855, entitled, " An act to enable railroad corporations to enter into operative contracts, and to borrow money," extends to horse railways.

One company using the road of another, must conform to the charter of the road used while doing so. If a lease is passed, it will be governed by the charter of the road leased.

The passage of ordinances by the common council of a city, which do not confer rights or authority, are harmless, until steps are taken to make them available. And it would seem that a common council cannot be enjoined from passing such ordinances.

THIS bill alleges, that on the tenth day of January, 1860, and long before, Clark street, in the city of Chicago, was a street running north and south, and crossing the Chicago river by a bridge. That a large number of teams, carts, wagons, etc., were passing along that street for business purposes. That the streets near the river, crossing Clark street east and west, were also greatly used by teams, etc., for business purposes. That said Clark street, from Randolph street to the river, about a distance of 975 feet, is a principal thoroughfare and greatly thronged. That the bridge across the Chicago river is a draw bridge. That when the bridge is drawn, passage along Clark street is delayed and impeded, and sometimes blocked up, to the inconvenience of the people and the property holders along the street. That horse railroad companies were chartered and organized, one for the north, one for the south and west divisions of the city of Chicago. That the complainants are interested in that part of Clark street which lies in the south division of the city. That the common council of the city, at the instance of the North Chicago City Railway Company, were about to pass the following ordinance :

"An ordinance authorizing the connection of the tracks of the North Chicago City Railway Company, and the Chicago City Railway Company.

" SECTION 1. Be it ordained by the Common Council of the city of Chicago, that the North Chicago City Railway Company is hereby authorized to extend its road across the Chicago river at such points and in such ways as that they shall make connections with the tracks of the Chicago City Railway Company, (by arrangement with said company,) at or near Randolph street, thereby making continuous lines of horse railroads between the different divisions of the city—and for this purpose the last named company is authorized to lay such tracks and extensions as will furnish all proper facilities for a convenient

and useful connection of said tracks.   The said North Chicago Railway Company, in consideration of the privileges hereby granted, agree to pay annually into the city treasury, the sum of one hundred dollars for each bridge that they may cross, for the purpose of keeping such bridge or bridges in repair; provided, further, that nothing herein contained shall authorize the cars of said companies to stand on South Clark street at any other place than along the east side of the public square as near the curb stone as possible, without interfering with the side-walk.

"Section 2.   The construction and operation of any road or roads, that may be built under this ordinance, shall be subject to all the rules and limitations and restrictions that are prescribed in the ordinance heretofore passed by the Common Council."

That the said North Chicago City Railway Company has no right or authority to operate a road in the south division, nor has the common council a right to grant such power.   That the Chicago City Railway Company has a track along Randolph street, crossing Clark street.   That the North Chicago City Railway Company has a track on North Clark street which approaches near the river, which is the only track by which the latter company can connect its track with those of the former company.   That the common council intend to pass the aforesaid ordinance, to authorize the north side company to cross the bridge and run along South Clark street, passing Randolph street, and that tracks will be laid, under color of the ordinance.   That complainants own property on South Clark street, where said road will run, to the value of $400,000, and are, by themselves or tenants, in possession.   That only the north side company applied for the ordinance, and that the south side company has no interest in the passage of the ordinance, and that it is to authorize the operation of the north side company contrary to its charter.   That the extension of the tracks of the north side company by such permission will not benefit the public, because the cars will be detained by the frequent opening of the bridge, and that if authorized to lay the track on South Clark street and operate it, the obstruction will constitute a public nuisance, and complainants will be irreparably and permanently injured, in the use and enjoyment of their property on the street, for which, damages which might be recovered at law would afford no adequate remedy, and that complainants and their tenants by being deprived of the use of the street in conducting their necessary affairs between Randolph street and the river, by the additional hindrance of the passage of teams, etc., will be greatly damaged, and the street will become impassable.

The bill then prays for an answer, and for an injunction to restrain the common council from passing any ordinance or giving any power whereby the North Chicago City Railway Company should or might, directly or indirectly, or by arrangement with any other company, corporation or person, construct or operate a railway across Clark street bridge, or on Clark street between Randolph street and the river, and from passing the ordinance hereinbefore copied, or any other ordinance with similar powers and provisions.

The order for an injunction was granted, and the writ of injunction accordingly issued.

On the third of February, 1859, the City appeared, and moved to dissolve the injunction:

1. Because there is no equity in said bill.

2. Because the injunction improperly issued, there being no sufficient reason assigned in said bill for an injunction.

3. Because the complainants are attempting illegally to interfere with said defendant, in a matter peculiarly within the authority and discretion of the common council.

4. Because the said bill shows no cause whatever for an injunction; it neither shows fraud, nor that its common council was attempting to do anything contrary to law, or what it had not a right to do.

5. Because said injunction illegally issued.

On the 27th of February, 1859, the motion to dissolve the injunction and dismiss the bill, was overruled. The City of Chicago then filed a demurrer to the bill, which was overruled, and the injunction was made perpetual, and judgment for costs was rendered against the City.

The defendant below brings the case to this court by writ of error, and assigns for error—

1. That the court below erred in overruling said plaintiff's motion to dissolve said injunction and dismiss said defendants' bill.

2. That the court below erred in overruling said plaintiff's demurrer to the bill of complaint of the said John Evans and others.

3. That the court below erred in making said injunction perpetual.

4. That the judgment and decree in the court below should have been for the plaintiff in error, and not for the defendants in error.

The defendants in error have appeared and joined in error.

C. BECKWITH, and HOSMER & PECK, for Plaintiff in Error.

VAN BUREN & GEARY, for Defendants in Error.

WALKER, J.  This record presents the question, whether under the act of 12th February, 1855, (Special Laws, 304,) horse railways in this State may unite their roads, and make running arrangements with each other.  That act, in terms, applies to all railroads organized or incorporated under, or which may be incorporated or organized under, the authority of the laws of this State, and it provides that they shall have the power to make such contracts and arrangements with each other for leasing or running their roads, or any part thereof, also the right of connecting with each other on such terms as shall be mutually agreed upon by the companies interested.  This language is manifestly sufficiently comprehensive to embrace horse railways as well as railroads whose cars are propelled by steam or other power, as well roads authorized to transport passengers only, as roads authorized to transport passengers and freight by other power.  The language of the enactment embraces all roads then organized, as well as those which might afterwards become so, and the act makes no distinction, or reservation, as to the character of the railroad.  The members of the General Assembly were fully aware that these various roads existed, and if any roads, answering either description, were not designed to be embraced, they would, it appears to us, have limited the operation of the act so as to have excluded them.  Horse city railways unquestionably fall within the description of the class of subjects of which they were legislating.  They are, in every sense of the term, railroads, they are incorporated under laws of the State, and are embraced within the language of the statute, and we have no doubt within its spirit.

Whilst a road chartered for the transportation of persons only, by the use of horse power, could not connect with a road authorized to employ steam power, so as to convert a horse railroad into one using steam, or a road only authorized to transport persons, into a road to transport passengers and freight, yet roads employing the same propelling power, and created for the same purposes, may so connect, under this act, as to use each other's roads, with their several cars, etc., or may lease from each other all or any portion of their several tracks, and use them for the purposes authorized by their charters. But when two roads connect with each other under this act, they acquire no new or greater powers and privileges than are conferred by their several charters, and each of such roads, while using the road of the other company, must, in all things, conform to the provisions of the charter of the company whose road is being thus used.  And when one company leases its road to another, the lessee must, in operating it, be governed by the charter of the lessor.  The lessee cannot use its franchise

and charter privileges on the road of another company, but for the time being must be governed by the charter of the road they are operating. Any other construction would lead to inextricable confusion, and the legislature could never have intended to permit each company, when running, or using their rolling stock upon another road, to carry with them their own charter and privileges wherever their cars and employees might go. We have no doubt that these two horse railways, created for the same purpose, and operated by the same description of propelling power, have the power to connect with each other, make running arrangements, or lease their tracks to each other, according to this act of the General Assembly.

We are unable to perceive any injury that could result to any person by passing the proposed ordinance of the common council. Such an ordinance could confer upon the companies no power, and it may be the act is useless; but, for aught that appears, the common council and the companies differed as to their charter privileges and power to so extend their roads as to connect with each other, without the assent of the common council, and if so, the dispute would be ended by the adoption of the ordinance, and its passage may have been desired for no other purpose. These companies must look to their charters for power, and if it is not thus conferred, it cannot be supplied by any action of the common council, but alone by the General Assembly. It may have been a question whether these companies had the power to extend their roads so as to connect, and the only object in procuring the adoption of the ordinance to obtain the consent of the city preparatory to an application for authority to thus unite their roads, without the design of proceeding to connect them, previous to procuring legislative authority for that purpose. And if so, no possible injury would result by the passage of the ordinance.

If the charter of these companies authorizes them to extend their roads on the streets in which they are located, until thereby their roads were connected, they may continue them within their several territorial limits until they intersect on the boundary, without any assent on the part of the city. If their charters confer no such power, the common council are unable to confer it. They could not extend their roads beyond the line of the territorial district to which their charters limit them. And if they were to attempt to continue their roads beyond, or to construct a road outside of those limits, under the city ordinance alone, they may undoubtedly be prevented by an appropriate remedy. But until they attempt to act outside of the authority conferred by the General Assembly, there can be no reason why the courts should interpose. The procuring the

adoption of this ordinance is not such an illegal and unwarranted act as can produce injury, and until they attempt to act under it as their only warrant, no reason is perceived why they should be stayed in their action. The passage of ordinances which confer no rights or authority, are harmless, until steps are taken to make them available.

For these reasons the decree of the court below is reversed, and the bill dismissed.

*Decree reversed.*