W. D. BLOXHAM, COMPTROLLER, ETC., APPELLANT, VS. THE CONSUMERS' ELECTRIC LIGHT AND STREET RAILROAD COMPANY, APPELLEE.

| 36 | 519 |
| 37 | 585 |
| 36 | 519 |
| 50 | 390 |
| 36 | 519 |
| f57 | 436 |

1. The word *railroad*, in its broadest signification, includes a street railroad. When the word is used in a statute there is no definite rule of construction as to whether it includes street railroads. It may, or it may not, include them. The meaning of the word must depend upon the context and the general intent of the statute in which it is used.

2. Besides judicial construction of statutes there is known to the law another kind of construction. This kind of construction has especial application to statutes for the regulation of the different departments of the government, and is the interpretation put upon them by the actual administration of them by such departments. As distinguished for judicial construction, it is called the practical construction of statutes.

3. A practical construction of a statute by a governmental department, while not of such high authority as a judicial interpretation of the act, is, when not in conflict with the Constitution or the plain intent of the act, of great persuasive force and efficacy.

4. The contention is made, that a street railroad extending along the streets of a single city, and wholly located within a single county, is not a railroad in the contemplation of our statute requiring railroads to be assessed for taxation by the Comptroller of the State, and that the same can be assessed for taxes only by the county tax assessor. For more than twelve years past the Comptroller of the State has, under the act in question, or acts of similar import, assessed all railroads for taxation, including street railroads located in a single city and county. The taxes have always been paid to the State upon such street railroads, upon such assessments, without objection; the Legislature, with knowledge of such practice, has several times repealed the statute containing such provision and passed other acts containing similar provisions; thousands of dollars having been collected under such assessments, and no objection made, and no attack upon the validity of the same; *Held*, that such practical construction of the act by an executive department of the government is a matter of which the court can take judicial notice, and that under the circum-

stances stated the greatest deference and respect should be paid to the same, and that the same should not be interfered with.

5. The courts can not enjoin an officer of the State from the collection of the State's taxes merely because they think he might adopt a mode which would be fairer and more equitable, if the mode he is pursuing is authorized by the statute. It is only when the tax is illegal, or is being illegally collected that an injunction should be granted.

6. The State's lien for taxes having attached by the assessment of the property, can not be divested by a subsequent judicial sale in a proceeding in which the State is not a party, even though the decree under which the sale was made direct, that the property be sold free from all liens and encumbrances. In such a case the lien continues until the taxes are paid, and a bill of complaint not alleging a payment or a tender of the taxes is demurrable.

7. Private parties have no right, in proceedings in which the State is not a party, by consent to have a decree entered which will divest it of its statutory tax lien upon the property involved in the suit, and force it to collect its taxes in some other manner than that prescribed by the statute. No court has jurisdiction or authority to enter a decree to such effect. The State, by its Legislature, has ample power to choose its own method of collecting its taxes, and when the method chosen violates no constitutional provision, no court can require it to adopt any other method.

Appeal from the Circuit Court for Hillsborough county.

The facts in the case are stated in the opinion of the court.

*The Attorney-General,* and *W. A. Carter,* State Attorney for Appellant.

#### BRIEF OF STATE ATTORNEY.

The facts in this case are, briefly, that, in the year 1893, the Tampa Street Railway Company was operating a railroad in the city of Tampa, incorporated under an act of the Legislature, Chapter 3657, laws of

1885; that, for the year 1893, the Comptroller assessed the taxes against said road to the amount of $296.10; that, the taxes being unpaid, the Comptroller, on the 22d of December, 1894, issued a warrant directed to the sheriff of Hillsborough county requiring him to collect that amount by a sale of the property of the company. The warrant was levied on the property and notice of sale duly advertised. Whereupon, the Consumers' Electric Light and Street Railroad Company filed a bill in the Circuit Court, asking for an injunction to restrain the sale, alleging in substance that, in December, 1893, a suit was commenced by the bondholders of the railroad company to foreclose the mortgage given to secure the bonds; that, in said suit, a receiver was appointed of the road and, on the 7th of April, 1894, under an order of the court made pendente lite, the receiver sold the railroad company, its property and franchises, and that they the complainants afterwards became the owners of the railroad; that the court, in its order, directed the road to be sold free from any encumbrance, and, consequently, the lien for the taxes was transferred from the railroad to the fund realized from the sale. They further allege that the railroad was improperly assessed by the Comptroller on account of its being a street railroad.

To this bill, the State filed a demurrer, which was overruled by the court and injunction granted. From these orders, the State has taken an appeal to this court.

The first ground on which the injunction was prayed was that the sale by the receiver conveyed the property free from the lien of taxes.

As a matter of fact, the tax became a lien upon the company's property on the first day of January, 1893, and the receiver was not appointed until December,

1893; consequently, it was an existing lien at the time of the receiver's appointment, and the receiver took the property subject to all valid liens, and any sale made by the receiver was subject to such liens, as they could not be divested by his appointment. The State of Florida was not a party to the suit in which the receiver was appointed; consequently its lien subsisted during the receivership and, immediately the property passed from the receiver's hands, could be enforced. See High on Receivers, 3d. Ed., sec. 138; Union Trust Co. vs. Webber, 96 Ill. 346; High on Injunctions, 3d. Ed·, sec. 191, page 166; also sections 199 (a) and 199 (b); High on Injunctions, sec. 602, 54 Iowa, page 200.

The other ground was that the tax was illegally assessed by the Comptroller, because the Tampa Street Railway was not such a road as the Comptroller was authorized to assess for taxes.

The court will see, upon examination of the act of the Legislature chartering the road, Chapter 3657, laws of 1885, that the Tampa Street Railway Company was clearly within the provisions of the law, it not being a street railway in the true sense of that word; but, further than this, under the laws of Florida, we are of the opinion that a street railway should be assessed by the Comptroller the same as a commercial railway.

*P. O. Knight*, for Appellee.

The facts in this case are, that in the year 1893, the Tampa Street Railway Company was operating a railroad in the city of Tampa under an act of the Legislature Chapter 3657, laws of 1885. That in the year 1893, the Comptroller assessed the taxes against said road to the amount of $296.10; that the taxes being unpaid, Comptroller on the 22d of December, 1894, issued a warrant directed to the sheriff of Hillsborough

county, requiring him to collect said sum by a sale of the property of the company. The warrant was levied on the property and notice of sale duly advertised, whereupon the appellee filed a bill in the Circuit Court asking for an injunction to restrain the sale, alleging in substance, that in December, 1893, a suit was commenced by the bondholders of the railroad company to foreclose a mortgage given to secure the bonds. That in the said suit, a receiver was appointed of the road and on the 7th day of April, 1894, under an order of court made pendente lite, and all of the parties to the cause consenting, the receiver sold the railroad, its property and franchise, for the sum of $70,000.00, and that the appellee became the owner of the property of the Tampa Street Railway Company.

It was further alleged, that said property was sold under the representation of the receiver that it was not realizing expenses and that the property was in a bad condition, needed repair and that there was not sufficient income in order to repair it, and that the sale was absolutely necessary to preserve anything whatever for creditors having any lien upon it. That in consequence of said representation, the court made an order and directed the road to be sold free from any and all liens and incumbrances whatsoever. The appellee further alleged that said amount of $70,000.00 was still in the hands of the receiver and subject to the lien of the State for taxes, and that it took the place of the property sold, and that it was the duty of the State to proceed against said funds in order to obtain payment of its taxes.

That said property was sold pendente lite; that it was the intention of said sale, that the money for which said property should be sold, should be brought into the registry of the court and represent said prop-

erty, and that any and all liens and incumbrances existing against the Tampa Street Railway & Power Company should be paid out of said fund and that said property sold, should be sold free from any and all liens and incumbrances whatsoever. That said property was so sold and the proceeds brought into the registry of the court and have remained there ever since.

Appellee further alleged that said property was assessed by the Comptroller of the State without warrant and authority of law, and that hence the assessment was absolutely void on account of its being a street railroad, and the taxes levied in consequence thereof, was without force.

It was also alleged in said bill that the property attempted to be levied upon, was a street railroad, the property consisting of a railroad constructed and operated through the streets of the city of Tampa for the carriage of passengers only.

To this bill the State filed a demurrer and admitted the facts as set forth in the bill, which was overruled by the court and an injunction granted, and from these orders the State has taken appeal to the Supreme Court.

### AUTHORITIES AND ARGUMENT.

The appellee takes three positions in this matter. 1st. We admit that the lien of the State is paramount to all other liens and that its lien can not be defeated by any decree of a court, except under certain circumstances, but we contend that where property is in the hands of a receiver, that it is entitled to the absolute protection of the court, and that the receiver can not be disturbed in that possession even by the State by virtue of its sovereign power for nonpayment of taxes,

and that the only way in which the State can collect
its taxes, is by petition to the court asking that the
receiver be instructed to pay its taxes. In support of
said proposition, I desire to cite your honors, the case
of ex parte Tyler page 875 of the Supreme Court Re-
porter, vol. 13, it being a decision of the Supreme
Court of the United States rendered April 24th, 1893,
where the court says on page 790: "The general doc-
trine that property in the possession of a receiver ap-
pointed by a court is in custodia legis, and that unau-
thorized interference with such possession is punisha-
ble as a contempt, is conceded, but it is contended
that this salutary rule has no application to the collec-
tion of taxes. Undoubtedly, property so situated is
not thereby rendered exempt from the imposition 'of
taxes by the government within whose jurisdiction the
property is, and the lien for taxes is superior to all
other liens whatsoever, except judicial costs, when the
property is rightfully in the custody of the law; but
this does not justify a physical invasion of such cus-
tody, and a wanton disregard of the orders of the
court in respect of it. The maintenance of the sys-
tem of checks and balances characteristic of republi-
can institutions requires the co-ordinate departments
of government, whether Federal or State, to refrain
from any infringement of the independence of each
other and the possession of property by the judicial
department can not be arbitrarily encroached upon,
save in violation of this fundamental principle.
The levy of a tax warrant, like the levy of an ordinary
fieri facias, sequestrates the property to answer the
exigency of the writ; but property in the possession
of receiver is already in sequestration, already held in
equitable execution, and, while the lien for taxes must
be recognized and enforced, the orderly administration

of justice requires this to be done by and under the sanction of the court. It is the duty of the court to see that this is done, and a seizure of the property against its will can only be predicated upon the assumption that the court will fail in the discharge of its duty—an assumption carrying a contempt upon its face."

The acceptance of the rule has been general, and but few decisions were cited on the argument in illustration of its application.

See also on page 791 where the court says as follows: "The inevitable conclusion that this must be so, if constitutional principles are to be respected in the payment of taxes, or the displacement or impairment of the lien thereof; but on the contrary, it makes it the imperative duty of the court to recognize as paramount, and enforce with promptness and vigor, the just claims of the authorities for the prescribed contributions to State and municipal revenue. And, when controversy arises as to the legality of the tax claimed, there ought to be no serious difficulty in adjusting such controversy upon proper suggestion, The usual course pursued in such cases is by intervention pro interesse suo, as in the instance of sequestration. 2 Danniell Ch. Pl. & Pr. (4th ed.) 1057, 1744; Savannah vs. Jesup, 106 U. S. 563, 564, 1 Sup. Ct. Rep. 512. The tax collector is a ministerial officer, (Erskine vs. Hohnback, 14 Wall. 613; Stutsman Co. vs. Wallace, 143. U. S. 293, 12 Sup. Ct. Rep. 227); and no reason is perceived why he should not bring his claim to the attention of the court, while on the other hand, it is clearly the duty of the receiver to do so, if he contends that the taxes are illegal. If found valid, they must be paid; if invalid, the court will so declare, subject to the review of the appellate tribunals."

See also County Commissioners vs. Clarke, 36 Md., 206; Greely vs. Bank, 98 Mo. 458; Central Trust Co. vs. N. Y. C. & H. R. R. Co. 110 N. Y. 250; Co. of Yuba vs. Adams, 7 Cal. 37; Ga. vs. R. R. Co. 3 Woods 434; W. U. Tel. Co. vs. Atlantic etc. Co. 7 Bis. 367; Covell vs. Haman, 111, U. S. 176, see also King et al. vs. Wotten, Circuit Court of Appeal 5th Ct. decided Feby. 1893, and cited on page 612, of Vol. 54 Fed. Rep.

See also sec. 139 of High on Receivers, 3d Ed. where Mr. High lays down the following proposition: "The possession of the receiver, being as already shown, regarded as the exclusive possession of the court from which he derives his appointment, the courts are exceedingly averse of allowing any unauthorized interference therewith, and will not tolerate any attempt to disturb him in his rightful possession, without leave of court being first obtained for that purpose, and when a person claiming any interest in the subject matter of litigation, is prejudiced by the appointment of a receiver or desires to ascertain his rights, the proper course for the court, is either to give him leave to bring an action or to permit him to be examined pro interesse suo, the latter being generally regarded as the most convenient and desirable practice."

See also secs. 140 and 140a in which Mr. High lays down the following proposition: "As still further illustrating the exclusive character of the receiver's powers and the jealousy with which it is regarded by the court, it is held that property in the possession of a receiver appointed by a Federal court as in the case of a receivership over a railway, while subject to taxation under the laws of the State, in which it is situated, cannot be levied upon and sold by an officer of the State in satisfaction of unpaid taxes. The remedy

of the officer in such case, should be sought by intervention in the suit in which the receiver was appointed, and that court may properly enjoin him from levying upon the property and has undoubted jurisdiction to punish him for contempt violating such injunction.

See also in case of Ellis vs. Vernon, I. L. & W. Co. 36 Texas, page 109, where the question is fully discussed, and also in the case of Cole vs. Oil Well Supply Co. 57 Fed. Rep. 534, where prior to the receivership in a Federal court, the property of defendant had been seized by a sheriff under attachment from a State court in an action against the defendant, a foreign corporation, which action resulted in judgment against the defendant and a levy of execution upon the property so attached, the Federal court refused upon petition of the receiver to order the surrender of the property by the sheriff.

See also sec. 141 High on Receivers where Mr. High says: "So extremely jealous are all of the courts of equity of any interference pendente lite of the possession of their receiver, that they will not ordinarily permit property which is the subject of receivership, to be sold under execution." I think no other cases are necessary to be cited in support of the proposition, as the matter is so fully stated in the authorities above cited and so exhaustively treated, especially in the case of in re Tyler 149 U. S. page 164 above cited.

And the position that appellee takes in this, that this property having been sold pendente lite and the case of the bondholders vs. the Tampa Street Railway Company still being pending and there still being a receiver in that case of the property of the Tampa Street Railway Co. and the court having sold the property to appellee, that appellee is just as much entitled to the protection of that property from interference upon the

part of any one as the receiver would be himself. The $70,000.00 which is in the custody of the court, represents the property of the Tampa Street Railway Co. It is there subject to the lien of the State for taxes. The court sold the property to appellee under a contract made with it whereby it should purchase the property free from any and all liens and incumbrances whatsoever, and it was no more than right or proper that when the State sought to interfere with that property before the same court, that the court knowing that the State could proceed against the fund and have the receiver ordered to pay the taxes due it, that appellee should be entitled to the protection of its property by a proper restraining order. It was the duty of the State to have filed a petition before the court asking payment of its taxes out of the fund, and the court would undoubtedly have ordered the payment of its taxes and will yet, upon a proper application. It was not right that the appellee having in good faith purchased the property free from tax liens, should be subject to embarrassment and to the annoyance of a suit, and then to be compelled to itself go before the court and ask to be re-imbursed out of that fund for whatever money it was compelled to pay to the State for taxes, if indeed it has the right to go before the court and ask to be re-imbursed out of said fund for whatever taxes it may be compelled to pay.

We think that under the case as made by the bill, that complainant was entitled to its injunction.

We lay down the further proposition, that a purchaser at a judicial sale, is entitled to look to the judgment or decree for the measure of his rights, and need look no further. It is his contract with the court and should not be changed.

34

We cite your honor to the case of the Central Trust Co. vs. the Wabash St. L. & P. Ry. Co. decided by the Ct. Ct. for the Eastern Dis. of Mo. and cited on page 332 of the 30th Fed. Rep. The court among other things there, says on page 336:

"It is as old as judicial sales, iterated and reiterated, with unvarying and emphatic voice, that a purchaser at a judicial sale looks to the judgment or decree for the measure of his rights. He does not look back of the decree to questions which might have been presented, or might have been differently determined between the litigating parties; he looks to the decree, and upon that alone he rests. That measures his rights. It is his muniment of title, and, when he purchases and pays, he has a right to say that that is his contract with the court, and no court ever did, and no court ever ought to, change the contract which it has made, when by its decree solemnly entered it invites persons to buy, and upon the faith of that invitation persons do buy and pay." Exactly as in this case, the court made a decree in which the property should be sold free from any and all liens whatsoever. It was the intention of the court that the peoperty should be sold free from tax liens. It was the intention of the court that whatever liens existed in favor of the State or of the county or of the municipality of Tampa, should be transferred to the fund arising from the sale of the property and that payment should be made out of the same. It was the intention of the appellee when it purchased said property, that it should purchase it free from tax liens. In good faith it did so purchase it, and it was a contract made with the court that it was the court's duty to stand by and protect, and it did so properly in granting the injunction.

We contend third; that the assessment of the Tampa Street Railway & Power Company by the Comptroller was without authority of law and absolutely void. The section under which the Comptroller sought to assess the property of the Tampa Street Railway & Power Company was sec. 376 of the Rev. Stat. of Fla. and the section under which the levy was made was 377 of the Rev. Stat.

A careful examination of the said sections will show that the Legislature never intended in those sections to cover the property of street railroad companies, but that what is meant by railroads were commercial railroads, running through the State or through different portions of the State. The only person that could assess real property and personal property under the laws of this State, is the county assessor. Booth on St. Ry. Law, sec. 271 says: "That ties, sleepers, rails, spikes and everything pertaining to the structure over which the cars are propelled can be classed as real property."

And in sec. 273: "That all the rolling stock, as horses and cars and all other movable property are taxable as chattels or personal property." And it has also been frequently decided that wires and polls are personal property and not real property. It is not necessary to cite to your honor the numerous authorities upon the question of the strictness with which the statute has to be complied with in order to make an assessment valid. Nothing can be taken by inference and there is nothing from which it can be inferred by a careful examination of sections 376 and 377 of the Rev. Stat. from which your honors could hold that the Comptroller has the right to assess the property of a street railroad company. Counsel for appellant says, that the court could see upon examination of the

act of the Legislature chartering the road. Chap. 3657, laws of '85, that the Tampa St. Ry. Co. was clearly within the provisions of the law, it not being a street railway in the true sense of that word. But while in the act creating the Tampa Street Ry. Co. it might have been given powers other than what is usually conferred upon street railway companies, yet, as to whether or not it is a street railroad is dependent upon the question of its construction, and its operation, and it matters not what it is called nor what powers are given it. The question as to what is a street railroad company and what is not, has frequently arisen where it has been sought to enjoin the building of a street railroad along a highway until condemnation proceedings were instituted by the street railroad company, the court well knowing that the building of a commercial railroad would be the imposition of an additional servitute upon the highway, whereas, the building of a street railway would be simply an improved method of using the highway; the building of it would not be the imposition of an additional servitude upon the highway and the abutting property owners would not be entitled to injunction against a street railroad for building its line in front of an abutting property owner, and in all of these cases the case has always hinged upon what as a matter of fact, the road was; not what its charter was, nor what its name was, not what the powers conferred upon it were.

I desire to cite your Honors to the case of Williams vs. the City Electric St. R. R. Co. decided by the U. S. C. C. for the Eastern Dis. of Ark. March, 1890, and cited on page 215. In Am. & Eng. R. R. cases vol. 43; where the court in describing the distinction between street and general railroads says as follows: "The difference between street railroads and railroads

for general traffic is well understood. The difference consists in their use, and not in their motive power. A railroad, the rails of which are laid to conform to the grade and surface of the street, and which is otherwise constructed so that the public is not excluded from the use of any part of the streets as a public way; which runs at a moderate rate of speed, compared to the speed of traffic railroads, which carries no freight but only passengers from one part of a thickly populated district to another, in a town or city and its suburbs, and for that purpose runs its cars at short intervals, stopping at the street crossings to receive and discharge its passengers—is a street railroad, whether the cars are propelled by animal or mechanical power. The propelling power of such a road may be animal, steam, electricity, cable, fireless engines, or compressed air all of which motors have been, and are now in use for the purpose of propelling street cars. Enclop. Brittanica (9th Ed.) tit. "Tramway." Doubtless, other methods of propelling the cars of street railroads will be discovered and applied. The Legislature having empowered the city to authorize the construction of street railroads, without qualification or restriction as to the motive power to be used on such roads, the city had the undoubted right to authorize animal or mechanical power to be used as motors on such roads. Sections 5468–5471, Mansf. Dig. relate to railroads for general traffic, and not to street railroads whether propelled by animal or mechanical power.

It would be useless consumption of time to cite authorities to show that it would be competent for the city, under its charter to authorize the construction and operation, on the streets of the city, of a street railroad propelled by animal power, without providing for compensation to the abutting lot owners; but the learned

counsel for the plaintiff insists that the rule is different where the propelling power is steam. The distinction attempted to be drawn between animal and mechanical power, as applied to street railroads, is not sound. The motor is not the criterion. It is the use of the street, and the mode of that use. A street railroad propelled by animal power might be so constructed and operated as to be a public nuisance, and render its owners liable to those injured by its improper construction and operation. The same is true of a street railroad operated by mechanical power. It may be so constructed and operated as to be a public nuisance, but the use of steam on such railroad, when authorized by law does not per se make it a nuisance, or entitle the owners of the abutting property to compensation, though the fee of the street is vested in them. It is common knowledge that steam motors for operating street railroads, are now constructed to emit so little gas, steam or smoke, and make so little noise, that they do not constitute any reasonable ground of complaint to passengers or the public. They can be stopped and started as quickly and safely as horse cars, and in some respects can be operated with greater accuracy and precision. Such motors are in use in cities and their suburbs in this country and in England. Enclop. Brittanica (9th Ed). The operation of a street railroad by such steam motors, when authorized by law, on a public street, is not an additional servitude or burden on the land already dedicated or condemned to the use of a public street, and is therefore not a taking of private property, but is a modern and improved use only, of the street, as public way, and affords to the abutting property owner, though he may own the fee of the street, no legal ground of complaint."

See further, Newell vs. M. B. & M. R. R. Co. decided by the Supreme Court of Minn. in April 1886 and cited in vol. 24 of Am. & Eng. R. R. Cases, in which this question is exhaustively treated.   See also sec. 1 of Booths St. Ry.   Law where the court defines a street railroad as follows:   "Street railways are those which are constructed in streets whether on, below, or above the surface, along and over which cars are propelled by animal or other power on fixed tracks as common carriers of passengers for the convenience and accommodation of the people living upon or near such highways, and to facilitate the transportation of travelers thereon.   When a railroad is laid in a street to facilitate its use by the public, it is a street railway, whatever the means used to propel its cars.   A distinctive and essential feature of a street railway, in relation to other railroads, is that it is exclusively for the transportation of passengers and not of goods."   And numerous cases cited in support of the proposition.

The bill of complaint alleges that appellee is operating through the streets of the city of Tampa, a street railroad for the accommodation of the inhabitants thereof, and that it is a street railroad and not a commercial railroad, and that is admitted by the demurrer; and our contention is, that it makes no difference what powers were conferred upon the Tampa Street Railway Company by its act of incorporation, but that it is solely a question of fact that as to whether it is a street railroad or a commercial railroad.   That the facts in this case show that it is a street railroad and that there is no authority of law whatsoever, for an assessment of this property by the Comptroller of the State, but that instead thereof it should have been assessed by the assessor of Hillsborough county.

That the assessment being illegal, the levy was illegal and the court did not err in enjoining the collection of the taxes of the State even though the first and second positions we have taken the court deem untenable.

LIDDON, J.:

The appellee, who was complainant in the court below, brought its bill of complaint to enjoin the appellant (defendant below) from selling a certain line of street railroad for the payment of certain State and county taxes. The property in question is an electric street railroad located upon certain streets of the city of Tampa, and wholly situated within the county of Hillsborough. The taxes sought to be collected are for the year 1893, and have not been paid. The property was levied upon and a sale thereof advertised. A demurrer to the bill of complaint, for general want of equity, and upon other grounds, was overruled, and a temporary injunction granted, restraining the sale of the property. The appeal is taken from these orders.

Without attempting to give, even in a digested form, the allegations of the bill of complaint, it is sufficient to say that two principal grounds are set forth why the proceedings to sell the property should be enjoined. Inverting the order in which they are stated in the bill of complaint, these reasons, briefly stated, are as follows: 1. That the assessment of the property by the Comptroller, under the statute regulating the assessment of railroads, was null and void, and that the same should have been assessed by the county tax assessor under the general statutes for the assessment of real and personal property. 2. That the property, after assessment, passed out of the hands of the parties owning it at the time of such assessment, and was

sold at a judicial sale, in proceedings to which the State was not a party; that the order under which such sale was made directed "that the same be sold free from any mortgages, judgments, mechanics', laborers', material men and other liens or incumbrances of any kind whatsoever, and that all parties consented thereto." That the property sold for a large sum of money, which was paid into the registry of the court, where it still remained. That such sale was confirmed and a deed made to the purchaser, conveying the property to him in fee simple, free from all liens and incumbrances. That the complainant is now the owner of the property. That the property was sold *pendente lite*, and that it was the intention of said sale that the money for which said property should be sold should be brought into court and should represent the property, and that any liens and incumbrances whatever existing against the same should be paid out of said fund, and that said property should be sold free from any and all liens and incumbrances whatever. Wherefore it is claimed that the property should not be held liable for the taxes, but that the same should be paid out of the funds in the registry of the court.

Under the first objection, that the assessment of the property by the Comptroller, under the statute regulating the assessment of railroads was illegal and void, it is urged that a street railway extending over the streets of a single city, and wholly located within the limits of a single county, is not a *railroad* within the meaning of the word as used in the statute. If a street railroad is not a railroad in contemplation of the statute, the assessment is illegal, but if it is such a railroad, the assessment is legal and proper. The question presented requires an examination of the

statute. Secs. 48 and 49, Chap. 4115, laws of Florida,
acts 1893. The forty-eighth section of the act pro-
vides, among other things, in substance, that certain
officers of a railroad company, or the "receiver of any
railroad, whose track or road-bed, or any part thereof,
is in this State," shall annually make a return to the
Comptroller of the State under oath, showing the total
length and value of such road, including branches,
side-tracks, lots, parts of lots, terminal facilities, etc.,
in this State; the total length and value thereof in
each county, city or incorporated town, and the num-
ber and value of all locomotives, engines, cars, etc.
If such return is not made, or the same when made is
not satisfactory to the Comptroller, then he, with the
assistance and advice of the Attorney-General and
Treasurer of the State, have the power to assess the
property from the best information obtainable, speci-
fying the values in each county. The value of the
rolling stock is apportioned to each county *pro rata*,
the length of the track, branches and side-tracks in
the same, and the respective county assessors and the
authorities of cities and towns notified accordingly;
and upon the valuation thus apportioned the taxes
shall be assessed as upon the property of individuals.
The forty-ninth section, among other things, provides
that the Comptroller, upon certificates showing default
of payment in any county, shall have the power to
issue a warrant directed to the sheriff of any county
where such defaulting railroad, or any part thereof,
is located, by which such sheriff is authorized to sell
the entire road, or such part thereof as may be neces-
sary, to pay such taxes and the costs and expenses of
sale. The proceeds of such sale are to be divided
among the counties where such taxes are due. The
Legislature, especially in the forty-eighth section,

seems to assume that every railroad in this State ex-
tends into and is situated in more than one county
thereof.    The forth-ninth section, however, implies
that a railroad may be wholly located in one county.
It is plain that the purpose and intention of the act
is, that railroads, and the rolling stock and appurte-
nances used in the operation of the same, should be
taxed as an entirety; that where it extends into dif-
ferent counties, there should be uniformity in the val-
uation and assessment thereof in such counties, and
that the value of the rolling stock, which is almost
constantly in motion, going from one county to another,
should be properly taxed without double taxation or
any dispute as to the *situs* of such property for taxa-
tion.    The word *railroad*, in its broadest signification,
would undoubtedly include a street railroad; all rail-
roads being more or less alike in their physical con-
struction.    It is said that when the word *railroad* is
used in a statute, there is no definite rule of construc-
tion as to whether it includes street railways.    It may
or may not include them.    The meaning of the word
must depend upon the context, and the general intent
of the statute in which it is used.    19 Am. & Eng.
Ency. of Law, 788; Chicago vs. Evans, 24 Ill. 52. The
word *railroad*, as generally used, applies to commer-
cial railways engaged in the transportation of freight
and passengers for long distances, and, as a general
rule, having steam engines for motive power, and mak-
ing stops at regular stations for the receipt and dis-
charge of freight and passengers.    The term "street
railroad" applies only to such roads, the rails of
which are laid to conform to the grade and surface of
the street, and which is otherwise constructed so that
the public are not excluded from the street as a public
highway, which runs at a moderate rate of speed com-

pared with commercial railroads, which carries no freight, but only passengers from one part of a thickly populated district to another in a town or city and its suburbs, and for that purpose runs its cars at short intervals. stopping at street crossings or other places irregularly, as the convenience of its patrons may require, for the receipt and discharge of its passengers. The cars upon such roads may be propelled by animal or mechanical power. ·Williams vs. City Electric Street Ry. Co., 41 Fed. Rep. 556. No case has been pointed out to us by counsel, and after much investigation we have been unable to find a judicial definition of the word *railroad*, occurring in any taxing statute similar to ours, as to whether or not it would include a street railroad.

Besides the judicial construction of statutes, there is known to the law another kind of construction. This kind of construction has especial application to statutes made for the regulation of the different departments of the government, and is the interpretation put upon them by the actual administration of them by such departments. As distinguished from judicial construction, it is called the practical construction of statutes. While not of such high authority as a judicial interpretation of the act, such practical construction of the class of statutes referred to, when not in conflict with the Constitution or the plain intent of the act, is of great persuasive force and efficacy. The system of taxation of railroads by the State Comptroller, in the manner prescribed by the sections of the act hereinbefore referred to, has existed in this State ever since the enactment of Chapter 1713, laws of Florida, acts of 1869. Slight modifications have at various times been made by different Legislatures, but the general system has remained unchanged. It is

well-known to all who are familiar with the history of
the State, and with the method of taxation pre-
vailing therein, that for at least twelve years past
the Comptroller of the State, under and by
authority of the statute under which the action sought
to be enjoined is taken, or statutes of similar import,
has assessed all railroads, including street railroads,
as being included within the general term railroads, as
the same is used in the law. Street railroads located
in a single city have been no exception to the general
rule. The taxes for many years have been paid to the
State under such assessments without objection; thou-
sands of dollars have been so collected, and no attack
whatever has been made upon the validity of such as-
sessment. This long prevailing construction is a mat-
ter of which the court can take judicial notice. West-
brook vs. Miller, 56 Mich. 148, 22 N. W. Rep. 256. It
is notorious that acts for the general collection of rev-
enue are generally formulated by, or under the advice
of the Comptroller of the State. Since this method of
assessing taxes upon street railroads have been in force,
the Legislature has several times, repealing former
acts, re-enacted the same provisions, thus giving legis-
lative sanction to the practical construction of the act
by the department of the State government which has
charge of the assessment and collection of taxes from
railroads. "Where there are different statutes *in pari
materia* made at different times, or even expired and
not referring to each other, they shall be taken and
construed as one system and as explanatory of each
other." Lord Mansfield, in Rex vs. Loxdale, 1 Bur-
row, 445, cited in Doggett vs. Walter, 15 Fla. text 367.
The question of the force and authority of a practical
construction of a statute has often been passed upon
by the courts. In Westbrook vs. Miller, *supra*, an

opinion delivered by Judge Cooley, it is said: "The construction placed by an executive department upon a statute affecting the performance of its duties is not lightly to be questioned, especially when it has become established by long usage and relates to matters of form only. But practical construction must not be allowed to defeat the manifest purpose of the statute." Further it is said in the same case: "When, in the performance of executive duties, it becomes necessary for the executive department to construe a statute, great deference is always due to its judgment; and the obligation is increased by the lapse of considerable time before its acts are called in question." Many authorities from the Supreme Court of the United States and from subordinate courts of the Federal system are cited to sustain the propositions announced.

The question involved is the method of taxation of the property in dispute. No question is raised of the liability of the property to taxation. No showing is made of any double assessment, or unequal, unjust or oppressive taxation. The taxes on the property for the year for which the assessment was made have not been paid. The property has not discharged the burden of taxation which rests upon it as upon all other property in the State not specially exempted by law. In such a case we think the greatest deference and respect should be paid by this court to the long prevailing construction of the statute made by the executive department of the State government, and we will not interfere with the same. We do not rest our conclusion upon the case of Westbrook vs. Miller, *supra*, but have examined many other authorities upon the subject which practically unanimously agree with that case. Among other cases of similar import are Johnson vs. Ballou, 28 Mich. 379; Malonny vs. Mahar, 1

Mich. 26; Solomon vs. Commissioners of Cartersville, 41 Ga. 157; Scanlan vs. Childs, 33 Wis. 663; Union Insurance Company vs. Hoge, 21 How. 35; Chesnut vs. Shane's Lessee, 16 Ohio, 599; S. C. 47 Am. Dec. 387; Wetmore vs. State, 55 Ala. 198; Edwards' Lessee vs. Darby, 12 Wheat. 206; United States vs. Gilmore, 8 Wall, 330; Kiersted vs. State, 1 Gill & Johnson, 231; Brown vs. United States, 113 U. S. 568, 5 Sup. Ct. Rep. 648, and various authorities cited therein; United States vs. Lytle, 5 McLean, 9; People ex rel. vs. Dayton, 55 N. Y. 367; Wright vs. Forrestal, 65 Wis. 341, 27 N. W. Rep. 52; Sutherland on Statutory Construction, sec. 309 et seq. In the case cited from 41 Ga. the court said, adopting the practical construction of a statute made by the executive department of the government, that if the matter were before them as an original, independent proposition, they would be inclined to hold differently, but yielded their own views to such practical construction.

This brings us to the consideration of the second ground upon which it was claimed that the injunction should issue. The allegations of the bill of complaint as to the manner of complainant's acquiring a title to the property is very vague and indefinite, there being no direct statement whatever that it acquired title through the judicial sale mentioned. We will consider the case, however, as if the bill contained such an averment. The property had been assessed for its taxes, and a lien for the same thereby acquired by the State before the judicial sale. The contention, however, is that although the State was not a party to the proceedings in which the sale was made, yet by virtue of the direction of the court that the property be sold free from any mortgages, judgments, mechanics', laborers', material men, or other liens and incumbrances

whatever, such sale divested the State's lien, so that it can not subject the property itself to the payment of the taxes assessed against it, but must intervene by petition in the suit, and obtain payment of the taxes from the funds in the registry of the court. It is contended that it would be inequitable for the State to now subject the property in the hands of complainant to the payment of taxes, when there is a fund in court from which such payment can be secured. Disposing of this minor contention first, we will quote the language of the Supreme Court of Rhode Island in the case of People's Savings Bank vs. Tripp, 13 R. T. 621, text 622: "The complainant contends that the collector ought to be enjoined because the levy and sale are inequitable and unfair. But in our opinion we can not enjoin him merely because we think he might adopt a mode which would be fairer and more equitable, if the mode he is pursuing is authorized by the statute. The collector is an official of the government, and has as much right as the court to use his own judgment in the execution of his office. It is only when the tax is illegal, or is being illegally collected, that the courts, which go furthest, grant an injunction." Other remarks applicable to this point will be used in disposing of other questions in the further course of this opinion.

The State's lien for taxes having attached by the assessment of the property, could not be divested by a subsequent judicial sale, even though the degree under which the sale was made should have directed that the property should be sold free from all incumbrances. The case of Mesker vs. Koch, 76 Ind. 68, is very much like the present one. The complainants, in the case cited, alleged that they had purchased the property at a judicial sale. The firm against whom the property

was assessed had gone into bankruptcy; that the taxes claimed were set forth in the bankruptcy schedule of indebtedness; that the same was a preferred claim, and that funds to pay the same had been in the hands of the assignee in bankruptcy, which fact was known to the treasurer. A demurrer to the bill was sustained. The court, affirming the decision, quoting Stokes vs. State, 46 Ga. 412, S. C. 12 Am. Rep. 588, held "that the State can enforce the payment of its taxes by a sale of the property upon which they are a lien, though the owner has been adjudged a bankrupt, and the assignee has sold the property to a third party. * * The State has the right to follow the property into whosesoever hands found. * The bankrupt law does not attempt to deprive a State of this power. True, it makes provision for the payment of the State taxes, if the State chooses to come into the bankrupt court and claim them, but she can not be compelled to come in. Hence, the assignee, by sale of a bankrupt's property can not divest the right of the State to enforce the payment of her taxes on the property, wherever it may be found." In the case of Stokes vs. State, *supra*, the property had been sold under an order directing that the same be sold free from incumbrances. The trial court instructed the jury as follows: "That if it appears that the tax was assessed upon this land for the year 1868, as the property of Hunt and Bryan, then the bankrupt court had no power to divest the lien of the taxes on the land in favor of the State, and that no sale or order of said court could interfere with the right of the State to collect said tax, and that said land, in whosoever's hands it might be, was still liable for the tax." This charge was affirmed as a correct statement of the law by the appellate court. The prin-

ciple stated in the cases quoted from are upheld by various authorities, among which are Black on Tax Titles, sec. 187; Freeman vs. Mayor. etc., of Atlanta, 66 Ga. 617; Atlanta and Richmond Air-Line R. R. Co. vs. State, 63 Ga. 483; Osterberg vs. Union Trust Company, 93 U. S. 424; Isaacs vs. Decker, 41 Ind. 410; Bodertha vs. Spencer, 40 Ind. 353. The sale under the decree of the court in the present case did not divest the State's lien for taxes. A proper interpretation of the decree of the court does not show that it intended to divest the State of its tax lien, even if it had the power so to do. Several classes of liens and incumbrances are expressly mentioned in the decree. The lien for taxes is not so mentioned. We need not invoke the doctrine of *expressio unius exclusio ulterius ast*, to show that a tax lien was not included in the decree, for it is well-settled that such a lien does not stand upon the footing of an ordinary lien, and is not displaced by a sale under a pre-existing judgment or decree unless so directed by statute. The lien continues until the taxes are paid, and the bill is demurrable unless it allege a payment or a tender of the taxes. Besides authorities above cited, see Rinard vs. Nordyke, 76 Ind. 130; Iler vs. Colson, 8 Neb. 331.

In reference to the contention that the State ought to intervene by petition in the suit pending in the court below, and collect its taxes from the money the proceeds of the property in the registry of the court, the undoubted weight of authority is, that while the State might so intervene if it chose, it can not be compelled to do so. Private parties have no right, in proceedings in which the State is not a party by consent, to have a decree entered which will divest it of its statutory tax lien upon the property involved in the suit and force it to collect its taxes in some other man-

ner than that prescribed by the statute. No court has jurisdiction or authority to enter a decree having such effect. The State by its Legislature has ample power to choose its own method of collecting its taxes. When the method chosen violates no constitutional provision, no court can require it to adopt any other method. To compel it to intervene in litigation to become a party to suits between private individuals or corporations, would impair the functions of the State government, would involve expense of court costs and counsel fees, delay and inconvenience in the collection of the public revenues. In this way taxes might be lost, the collection of them endangered, and the costs of collection would certainly be swelled by the fees and expenses of litigation. Annely vs. DeSaussure, 12 S. C. 488, text 511; Smith vs. Gatewood, 3 S. C. 333.

The counsel for appellee relies with much confidence upon the case of *In re* Tyler, 149 U. S. 164, 13 Sup. Ct. Rep. 785, and upon cases cited by the court in said opinion. What we have said disposes of the case before us, but in view of the earnestness with which the cases mentioned have been pressed upon our attention, we deem it not inappropriate to refer briefly to them. We can not enter into any critical analysis of each case because such a course would extend this opinion to undue length. The case of *In re* Tyler was a *habeas corpus* proceeding to relieve from punishment for contempt a South Carolina sheriff who had levied a tax execution or warrant upon property in the hands of a receiver appointed by a United States Court. An injunction had been previously issued against the levy, and the taxes sought to be enforced had been held illegal by the court. The Supreme Court denied the writ of *habeas corpus* upon the ground that the prop-

erty in question was in *custodia legis*, and that the duty of the court to protect it from all interference extended to the levy of a tax warrant. Without expressing any assent to or dissent from the doctrine announced, it is sufficient to say that the facts of this case are entirely different from the Tyler case. The property here levied upon is not in the custody of the court. It has been sold under order of court to private parties, and is in their exclusive ownership and possession. There is no ground for the contention in the present proceeding of an interference with the property in the possession of a receiver, an officer of the court. The money (the proceeds of the sale of the property) may be considered as in *custodia legis*, but the property itself is free and discharged from the care and custody of the court.

In the case of Central Trust Company vs. New York City & Northern R. R. Co., 110 N. Y. 250, 18 N. E. Rep. 92, the converse of the proposition contended for by appellee was asserted. There the State intervened and sought to enforce the payment of taxes of a railroad that had gone into the hands of a receiver from funds in his hands arising from the operation of the road. The statute pointed out a different remedy, and it was claimed that the statutory remedy should have been pursued. The court held that the State was not confined to the statutory remedy, but that the court might order the taxes paid upon the petition of intervention.

Several other cases cited by appellee show that where the proceeds of property subject to payment of taxes has come into the custody of a court, such court might upon the intervention of the State direct the taxes paid by the receiver or officer holding such funds. But none of them hold that the State in a case where the

property has been sold and discharged from the custody of the court is compelled to seek payment of its taxes from the proceeds of the property in the custody of the court. On the contrary, one of the cases cited by appellee (Savannah vs. Jesup, 106 U. S. 563, 1 Sup. Ct. Rep. 512) shows that the course pursued by the State in the present instance is a correct one. In that case the court said: "If the city had a valid claim for taxes, * * two courses were open to it—to postpone action under its executions until the proceedings in the Circuit Court of the United States were concluded, and its possession of the property, by receivers, had ended; or, with leave of court, to file a petition *pro interesse suo*, submitting its claim for judicial determination. It adopted the latter course." It is useless to further cite or analyze the cases in appellee's brief. The most that can be claimed for any of them is that they forbid an interference by virtue of a tax warrant with property actually in the custody of the court. None of them are authority for the proposition that a tax warrant can not be levied upon property which has been discharged from such custody. The doctrine is laid down in High on Receivers, sec. 602, that real estate which has been held by a receiver, where the title did not vest in him, after the termination of the possession of the receiver is subject to the lien of a judgment and execution against it the same as if there had never been any receivership. If this is true of the lien of an ordinary judgment, the reason is much stronger for applying it to the lien of the State for taxes, which is the highest of all liens.

The decrees appealed from are reversed, with directions to the court below to enter an order dissolving the temporary injunction granted in the cause, sus-

taining the demurrer, and dismissing the bill of complaint. The order dismissing the bill of complaint not to be entered if complainant desired to make a further case by amendment. In such event the usual course will be taken.