ERNEST AMOS AS COMPTROLLER OF THE STATE OF FLORIDA, AND R. J. PATTERSON, J. V. BURKE AND JOHN NEEL, AS MEMBERS OF AND CONSTITUTING THE STATE TAX COMMISSION OF THE STATE OF FLORIDA, *Appellants*, *v.* W. H. MOSLEY, *Appellee.*

Opinion filed December 20, 1917.

1. Where the Constitution provides that each house of the legislature shall "keep a journal of its proceedings which shall be published," and expressly requires that "the vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the journal of each

house," the journals are conclusive on the point whether the yea and nay vote was so taken and entered.

2. In testing the question whether an act of the legislature was passed in conformity with the requirements of the Constitution, the journals of the houses of the legislature will be examined; and if they furnish conclusive evidence that any bill was not passed in a constitutional manner it cannot be recognized as a law.

3. Under constitutional requirements that journals of the proceedings of the legislative bodies shall be kept and published, where the journal entries as to the legislative proceedings are explicit, and conflict even with legislative acts regularly authenticated, the journals are superior, and the courts will be governed by them as to matters clearly, explicitly and affirmatively stated therein.

4. It is common knowledge which this court can take cognizance of, that the proceedings of each house of the legislature are printed daily in pamphlet form, and published and distributed.

5. The daily printed pamphlets which contain the record of the proceedings of each house of the legislature, are the "Journals" of the respective houses.

6. Those things of which a court may take judicial notice require no proof.

7. Judicial notice is superior to evidence as it stands for proof and fulfils the object which evidence is designed to fulfil and makes evidence on the point established by judicial notice unnecessary.

8. Judicial notice is taken only of those matters which are commonly known.

9. Individual and extra judicial knowledge on the part of a judge will not dispense with proof of facts not judicially

cognizable and cannot be resorted to for the purpose of supplementing the record.

10. It is not essential that matters of judicial cognizance be actually known to the judge; if they are proper subjects of judicial knowledge, the judge may inform himself in any way which may seem best in his discretion, and act accordingly.

11. Journals of a branch of the legislature are public records. "They prove their own authenticity." Being kept in virtue of a provision of law, judicially known to the judge, their existence and function in legislation are also judicially known.

12. In determining the validity of a law found upon the statute books, where it is attacked upon the ground that the constitutional requirements were not observed in its passage through the legislature, the courts should not exclude from their knowledge matters of general and common knowledge which they are presumed to share with the public generally.

13. A specific provision for the payment of salaries and expenses, necessary, proper, incidental, or growing out of a law itself, or which may be deemed needful in carrying it or its subject into execution, being matter properly connected with the subject of the law as expressed in the title, is not prohibited by the Constitution.

14. An act, the general purpose of which is not to make appropriations for salaries of public officers and for other current expenses of the State, may make provision for the payment of expenses necessary, proper, incidental, or growing out of the law itself, including the salaries of persons whose services and duties are provided for in the act.

15. The purpose of the constitutional provision that "laws making appropriations for the salaries of public officers and other current expenses of the State shall contain provisions upon no other subject" is to prevent including in bills ap-

propriating money to carry on the government of the State, measures foreign to that purpose, and by taking advantage of the necessities of the State, force the legislature to adopt them, or stop the entire machinery of the government for want of funds to carry it on.

16. Where a law is not primarily one to appropriate money to pay "salaries of public officers and other current expenses of the State" it is not obnoxious to the Constitution because as an incident to its main purpose it provides for salaries and expenses necessary to carry into effect the purpose of the law.

17. A practical construction of a statute by a governmental department while not of such high authority as a judicial interpretation of the act, when not in conflict with the Constitution or the plain intent of the act, is of great persuasive force and efficacy

18. The construction placed upon a provision of the Constitution by the legislative and executive branches of the government, will not be permitted to overturn and render nugatory a clear provision of the Constitution, in cases where the meaning of a clause in the instrument is capable of two interpretations.

19. The provision of the Constitution which requires that "The legislature shall provide for raising revenues sufficient to defray the expenses of the State for each fiscal year," is not an inhibition on the power of the legislature to make continuing appropriations.

20. The burden of showing that an Act of the Legislature which has been duly signed by the presiding officer of each house and by the secretary of the Senate and clerk of the House of Representatives and has become a law with or without the approval of the Governor as shown by the records of official acts of the legislative department as the same are kept by the Secretary of State as required by Section 21 of Article IV of the Constitution, is upon the person who

asserts that the act did not pass in the manner prescribed by the Constitution.

Appeal from Circuit Court for Leon County, E. C. Love, Judge.

Judgment reversed.

*Van C. Swearingen,* Attorney General, and *C. O. Andrews,* Assistant, *H. Stafford Caldwell* and *Glenn Terrell,* for Appellants;

*Y. L. Watson* and *W. J. Oven,* for Appellee.

Browne, C. J.—This is a suit in equity by W. H. Mosley in the Circuit Court for Leon County, to enjoin the Comptroller from issuing warrants to the members of the Tax Commission in payment of their salaries.

A temporary restraining order was made by the chancellor and an appeal is taken therefrom to this court, which raises the question of the validity of Chapter 6500 Laws of Florida, Acts of 1913.

This attack is predicated upon the grounds that the Journals of the proceedings of the Senate for the Session of 1913 do not show that on the final passage of the bill the vote was taken by yeas and nays, and entered on the Journals of that body as required by Section 17 of Art. 3 of the Constitution, and because the bill contained a section making appropriations for expenses, it was in violation of Section 30 Art. 3 of the Constitution of the State of Florida, which provides that "Laws making appropriations for salaries of public officers and other current expenses of the State, shall contain provisions on no other subject."

At the hearing of the application for a temporary injunction the complainant offered in evidence, which was admitted without objection on the part of the respondent, a bound volume of what purported to be the Journals of the Senate of Florida for the Session of 1913, to which was attached the following certificate from the Secretary of State: "I, H. Clay Crawford, Secretary of State of the State of Florida, do hereby certify that the attached volume is a true and correct copy of the Journal of the Senate of the State of Florida, showing the proceedings of the Senate during the Session of the Legislature held in 1913, as filed in this office."

The defendants offered in evidence what purported to be a certified copy of page 132 of the daily printed Journal of the Senate for June 4, 1913, which was admitted over the objection of the complainant.

It is a well settled rule in this State that where the Constitution says that each house of the legislature shall "keep a journal of its proceedings which shall be published," and expressly requires that "the vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the journal of each house," the journals are conclusive on the point whether the yea and nay vote was so taken and entered. Thus in State ex rel. Attorney General v. Green, 36 Fla. 154, 18 South. Rep. 334, this court said: "It is generally held that the plain constitutional injunctions as to the mode and manner of enacting laws are mandatory, and the equally high authority that journals of the proceedings shall be kept, strengthens the view that the evidence of a compliance with such injunctions should be found in the journals." See also Wade v. Atlantic Lumber Co., 51 Fla. 628, 41 South. Rep. 72; Mathis v.

State, 31 Fla. 291, 12 South. Rep. 681; State *ex rel.* Markens v. Brown, 20 Fla. 407. In the latter case this court held, "In testing the question whether an act of the legislature was passed in conformity to the requirements of the Constitution, the Journals of the Houses of the Legislature will be examined; and if the Journals furnish conclusive evidence that any bill was not passed in a constitutional manner it cannot be recognized as a law."

The rule in this State is thus stated by Chief Justice MABRY in the case of State *ex rel.* Attorney General v. Green, *supra* "There are two conflicting views held by the decisions on this subject. Under constitutional requirements that journals of the proceedings of the legislative bodies shall be kept and published, it has been held in many decisions that where the journal entries, as to the legislative procedings, are explicit, and conflict even with legislative acts regularly authenticated, the journals are superior, and the courts will be governed by them as to matters clearly, explicitly and affirmatively stated therein. The other view, maintained by high authority, is that the legislative act itself embodied in a bill engrossed and enrolled, and bearing the proper official signatures, is of higher dignity than the journals, and will override them. This court has placed itself on the side of those maintaining the view first stated (State *ex rel.* v. Brown, 20 Fla. 407; State *ex rel.* v. Deal, 24 Fla. 293, 4 South. Rep. 899; Mathis v. State, 31 Fla. 291, 12 South Rep. 681) ; and as there is ample authority to sustain this view, we will not now make any departure."

The question, however, which we must first determine is, what is the journal? Is it the bound volume which purports to be a copy of all the journals of the entire

session, or is it the printed and published pamphlet which contains the record of each day's proceedings? The word journal is derived from the French word *jour*, which means "day." The Century Dictionary defines a journal to be a "diary or daily record; an account of daily transactions or events;" and says that "journal" is a doublet of "diurnal," from the Latin *diurnalis*. The journals which the Constitution requires each house of the legislature to keep is, therefore, a daily record. It is common knowledge which this court can take cognizance of, that the proceedings of each house of the legislature are printed daily in pamphlet form, and published and distributed. In the record of the proceedings of the second day of the session of 1913 we find a resolution unanimously adopted, providing, "That the State Printer be directed to furnish for the use of the Senate, two thousand (2000) copies of each day's journal; that each Senator' shall be entitled to have mailed out, as he may direct, fifty (50) copies of each day's journal; and that the Sergeant-at-Arms shall see that said journals are mailed in accordance with lists to be furnished by the several Senators." These are corrected daily under the orders of business "Reading the Journal" and "Correcting and approving the Journal," and are published and distributed to the people of the State, in conformity with the purpose of the constitutional provision requiring them to be published.

The law with regard to binding the journals in one volume, is found in Section 652 General Statutes of Florida, and further provides for them, to be indexed by the Attorney General, and that "the indexes, with the Journals shall be delivered to the contractor who shall print and bind the same without delay." Here is a statutory recognition of the daily printed pamphlets

as "the journals," and a provision for a reprint of them
by a contractor.   There is no provision for any official
to examine and certify to the correctness of the work
of the contractor, but when he completes the work of
printing and binding the copies made by him of the
original journals, he is to deliver two hundred and fifty
of them to the Secretary of State who is to furnish
certain officials with a copy, "and retain in his office the
remaining copies for gratuitous distribution to any one
who may desire a copy and will deposit or forward a
sufficient amount to prepay postage thereon."  These
bound volumes which purport to be a reprint of the
original journals of each day, are not examined or cor-
rected by the members of the respective houses, and
errors could readily be made in the printing, and com-
pilation which they would have no opportunity to detect,
or correct if detected.   It would be dangerous indeed to
give absolute verity to the product of the work of a
contractor who was not an officer of the State, and
whose mistakes would destroy the work of the legis-
lature constitutionally performed.   This does not apply
to the daily pamphlets, which are placed on the desk
of every member of the legislature, and ample oppor-
tunity afforded to correct all errors—typographical or
otherwise; the corrections appearing in the journal of
the succeeding legislative day.

In the case of State ex rel. Turner v. Hocker, 36 Fla.
358, 18 South. Rep. 767, Mr. Justice TAYLOR who deliv-
ered the opinion of the court said: "It is well settled
that the journals kept by the two houses of the Legis-
lature of their proceedings are public records of which
the courts will take judicial notice."

In the case of Bloxham v. Florida Cent. & P. R. Co.,
35 Fla. 625, 17 South. Rep. 902, the court in order to

satisfy itself about a matter not in the record examined the articles of incorporation of the Florida Central & Northern Railroad Company which were on file in the office of the Secretary of State, and used the information thus derived in reaching a conclusion on certain aspects of the case.

In the case of Wade v. Atlantic Lumber Co., 51 Fla. 628, 41 South. Rep. 72, this court took judicial notice of the journals of the two houses of the legislature. In that case an act granting lands to the Atlantic, Suwannee River & Gulf Railroad Company was attacked on demurrer to a bill, one of the grounds being that the title of the act was insufficient to embrace the land grant. This court resorted to the journals of the Senate and House and followed the bill in its course through those bodies and in the Joint Committee on Enrolled Bills and found that the title of the bill as introduced and voted on was different from and more restricted than the title as published in the printed acts as Chapter 4267 Laws of Florida, Acts of 1893, and treated the act as having the more restrictive title which the court took judicial notice of from its examination of the journals.

In these cases, the court acted in accordance with a well established rule, that those things of which a court may take judicial notice requires no proof. Thus, in State v. Main, 69 Conn. 123, 37 Atl. Rep. 80, the court said: "Judicial notice takes the place of proof, and is of equal force. As a means of establishing facts, it is therefore superior to evidence, since, as it stands for proof, it fulfills the object which evidence is designed to fulfill, and makes evidence unnecessary. * * * If, in regard to any subject of judicial notice, the court should permit documents to be referred to as testimony

introduced, it would not be in any proper sense, the admission of evidence, but simply a resort to a convenient means of refreshing the memory, or making the trier aware of that of which everybody ought to be aware."

We take the following from Vol. 15 Ruling Case Law, pp. 1060-1061: "Judicial knowledge in any case is by no means determined or limited by the knowledge of the particular judge or court. Where a judge is personally conversant with a fact which is judicially cognizable, proof thereof is of course not required. But judicial notice is taken only of those matters which are 'commonly' known. And therefore individual and extrajudicial knowledge on the part of a judge will not dispense with proof of facts not judicially cognizable and cannot be resorted to for the purpose of supplementing the record. On the other hand, it is not essential that matters of judicial cognizance be actually known to the judge. If they are proper subjects of judicial knowledge, the judge may inform himself in any way which may seem best in his discretion, and act accordingly."

On the question now under consideration—the right of this court to take judicial notice of the legislative journals—Chamberlayne in his work on the Modern Law of Evidence, Vol. 1, Sec. 661, says: "Journals of a branch of the legislature are public records. 'They prove their own authenticity.' Being kept in virtue of a provision of law, judicially known to the judge, their existence and function in legislation are also judicially known. Judges of a majority of American States hold that they may resort to these journals for the purpose of ascertaining what is the law which they are charged with the responsibility of knowing at their peril;—when

a statute went into effect whether it was properly enacted, and facts of similar nature. In so doing, they Judicially notice facts brought to their attention on such inspection, and give effect to them even to the extent of controlling the official certificate of enactment."

Judge Cooley announces the same doctrine in his work on Constitutional Limitations, and as a Justice of the Supreme Court of Michigan. In the 7th Ed. page 193 of the former he says: "Each House keeps a journal of its proceedings, which is a public record, and of which courts are at liberty to take judicial notice."

In the case of People ex rel. Drake v. Mahoney, 13 Mich. 481, he says: "As the courts are bound judicially to take notice of what the law is, we have no doubt it is our right, as well as our duty, to take notice, not only of the printed statute books, but also of the journals of the two houses, to enable us to determine whether all the constitutional requisities to the validity of a statute have been complied with."

The Supreme Court of Wisconsin says: "The courts will take judicial notice of the statute laws of the State, and to this end they will take like notice of the contents of journals of the two houses of the legislature far enough to determine whether an act published as a law was actually passed by the respective houses in acordance with constitutional requirements." McDonald v. State, 80 Wis. 407, 50 N. W. Rep. 185.

The case of Worthen v. Badgett, 32 Ark. 496, was submitted on demurrer to a bill to which was attached as an exhibit, a transcript from a House Journal, which failed to show that the bill passed, but the court went beyond the proof thus submitted, and made "a personal examination of the House Journal," which had not been

offered in evidence, and decided the case upon what it found from its personal inspection. In all the States where the rule exists that the validity of a law may be impeached by the journals, and some which hold the contrary rule, the courts take judicial notice of the journals. See Stein v. Leeper, 78 Ala. 517; Worthen v. Badgett, 32 Ark. 496; City of Evansville v. State *ex rel.* Blend, 118 Ind. 426, 21 N. E. Rep. 267; Spangler v. Jacoby, 14 Ill. 297; Barnard v. Gall, 43 La. Ann. 959, 10 South. Rep. 5; Legg v. Mayor of Annapolis, 42 Md. 203; People *ex rel.* Drake v. Mahoney, 13 Mich. 481; State *ex rel.* Douglas County v. Frank, 61 Neb. 679, 85 N. W. Rep. 956; Opinion of the Justices, 52 N. H. 634; People *ex rel.* Scott v. Supervisors of Chanago, 8 N. Y. 317; Miller v. State, 3 Ohio St. 475; Portland v. Yick, 44 Ore. 439, 75 Pac. Rep. 706; State v. Platt, 2 S. C. 150; Williams v. State, 6 Lea (Tenn.) 549; Richie v. Richards, 14 Utah 345, 47 Pac. Rep. 670; In re Welman, 20 Vt. 653; Osburn v. Staley, 5 West Va. 85; McDonald v. State, 80 Wis. 407, 50 N. W. Rep. 185; State *ex rel.* Sullivan v. Schnitger, 16 Wyo. 479, 95 Pac. Rep. 698; Blake v. National Banks, 23 Wall. (U. S.) 307; Gardner v. Collector, 6 Wall. (U. S.) 499. This rule which is in accord with sound reason, is supported by the great weight of the authorities.

In determining the validity of a law found upon the statute books, where it is attacked upon the ground that the constitutional requirements were not observed in its passage through the legislature, the courts should not exclude from their knowledge matters of general and common knowledge which they are presumed to share with the public generally. This does not mean knowledge which they individually possess by reason of per-

sonal investigation and research, but matters of common notoriety which because of such notoriety they share or should share in common with the public. It has been well said, however, that "This power is to be exercised by courts with caution. Care must be taken that the requisite notoriety exists." Brown v. Piper, 91 U. S. 37. The courts of the land which are charged with the great responsibility of determining matters upon which the life and death of a human being may depend, can well be trusted to exercise the proper caution in determining what matters it will take judicial notice of. It is upon the wisdom and discretion of the judges of our courts, that the doctrine of judicial notice must rest.

In this State, the constitution requires each house of the legislature to "keep a Journal of its proceedings which shall be published," and it is a matter of common and general knowledge that the Senate and House of Representatives cause the record of their proceedings to be published daily in pamphlet form and distributed generally throughout the State, and where the validity of a statute is attacked on the grounds that the constitutional requirements in its passage by the legislature were not obeyed, it is our duty to take judicial notice of these journals, to satisfy ourselves about what actually transpired in the passage of the act. This we have done, and as the daily printed journal of June 4th, 1913, kept by the Senate, which we have before us, and of which the court takes judicial notice, shows that the yea and nay vote on the final passage by the Senate of Chapter 6500, was entered on the Senate Journal immediately before an entry stating that the bill passed the Senate, such vote being 20 to 8 for the passage of the bill, the mere fact that the bound copies of the journals printed and bound by a contractor under the statute and

filed with the Secretary of State do not show such yea and nay vote in immediate connection with the entry · that the bill here considered passed the Senate, but such vote does, by mistake or otherwise, appear on the same page in connection with the final passage by the Senate of another bill, does not overcome the probative force of the daily journal kept by the Senate under the constitution, of which daily printed journal the court takes judical notice without proof.

It appearing from the daily journal of the Senate of June 4, 1913, that the vote on the final passage of the bill was taken by yeas and nays, was entered on the Journal of the Senate, and passed by a vote of twenty yeas to eight nays, the objection to the law on this ground is not sustained.

Before leaving this branch of the case we call the attention of the Legislature to the fact that there is no provision in our laws for filing the daily printed journals of the respective branches of the legislature in the office of the Secretary of State or elsewhere, where they may be at all times available to the courts.

The next ground of attack on the bill is that it is in violation of Section 30, Art. 3 of the Constitution which provides that "Laws making appropriations for salaries of public officers and other current expenses of the State shall contain provisions on no other subject."

It is contended by the appellee that because the bill creating the State Tax Commission, contained a section making an appropriation for the payment of the salaries of the commissioners, it is in contravention of the Constitution. Such a construction eliminates the second clause of the paragraph "and other current expenses of the State," and extends the restriction to any law con-

taining an appropriation for the salary of an official. This provision of the Constitution must be considered in its entirety; and when so construed, it becomes apparent that it refers to what is known as the General Appropriation Bill. No more apt words than "salaries of public officers and other current expenses of the State" could be used to describe the law in which such appropriations are made at each legislative session. This, however, will not prevent a law other than the General Appropriation Bill, the purpose of which is to provide for salaries *and other current expenses of the State* from being obnoxious to the provision of the Constitution under consideration. In the advisory opinion of Mr. Justice WESTCOTT in 14 Fla. 283, the Governor asked the opinion of the Judges of the Supreme Court "upon the proper construction to be put upon the aforesaid Section 3 of the *General Appropriation Bill,*" and in answering the inquiry, Mr. Justice WESTCOTT says: "The third section of the *'General Appropriation Bill'* which you call our attention to" etc. Thus both the Executive and Judicial Departments of the government stand sponsors for calling laws described in Sec. 30, Art. 3, "General Appropriation Bills." As the law under consideration in the first advisory opinion was one "providing for salaries of public officers and other current expenses of the State Government," called by the Governor and the Supreme Court the "General Appropriation Bill," the decision applies exclusively to such laws.

In the second Advisory Opinion of the Justices, Sec. 2, Art. XI of the Constitution which provides for raising revenues for the government, and Sec. 30, Art. IV, in relation to "laws make appropriations for salaries of public officers and other current expenses of the State" were under consideration, and Mr. Justice WESTCOTT

said: It would seem to follow from this, that the spirit, if not the letter of the Constitution, renders the junction of a law making appropriations for salaries and other current expenses with any other subject obnoxious to the charge of a violation of its provisions." Construing these opinions together, it is apparent that it was the General Appropriation Bill that he referred to when he said there must not be a junction therein with any other subjects, and was but a reiteration of the law announced in the first advisory opinion, as to what should not be contained in the General Appropriation Bill. Wherever in this advisory opinion the words "law making appropriations for salaries of public officers and other current expenses of the State" are used, they must be taken to mean the General Appropriation Bill, because in the first advisory opinion he used that term to describe such a law as referred to in Sec. 30, Art. 3 of the Constitution. As if apprehensive lest in a case such as that now under consideration, isolated sentences from their opinion might be cited for a purpose other than the court intended, it added with prophetic vision, this clarifying paragraph. "It would not, however, result from this that a specific provision for the payment of expenses, necessary, proper, incidental, or growing out of a law itself, or which may be deemed needful in carrying it or its subject into execution, would not be valid, because such a provision being matter properly connected with the subject of the law as expressed in the title, would not be prohibited by the Constitution. For instance the provisions for the payment of the persons employed, and the expenses of all kinds incurred in the assessment and collection of the revenue, are matters properly connected with such assessment and collection, and cannot be disconnected therefrom."

In the case of State v. Southern Land & Timber Co., 45 Fla. 374, 33 South. Rep. 999, a distinction is drawn between General appropriation laws, and a law making an appropriation. In that case an attack was made on the tax levy for State Board of Health purposes, and this court said: "It is contended that inasmuch as there is no appropriation for board of health purposes in the general appropriation law of 1897, there could be no levy for that purpose, as such levy would violate sections 3 and 4, Article IX of the Constitution. The legislature seems to have regarded Section 784 Revised Statutes as being *ex propria vigore,* equivalent to an appropriation law, as we can discover no appropriation in the general appropriation laws for the board of health purposes. This is the practical construction placed upon the section by the administrative officers of the State, and we think the language of the section warrants this construction, especially so, taken in connection with Sec. 1, Art. XV of the Constitution. No error of law appears in the rate of State taxation for 1897."

Section 784 Revised Statutes, which Mr. Justice HOCKER who delivered the opinion of the court said was equivalent to an appropriation law, is Section 20 of the State Board of Health Act passed at the extra session of the Legislature, 1889, which provides "There shall be annually levied and collected upon the assessable property of the State a tax of not more than half mill, the revenue derived from which assessment and collection shall constitute a special fund to be used for public health purposes of the State."

There seems to be no reason why an act, the general purpose of which is not to make appropriations for salaries of public officials and for current expenses of the State, may not, as was said by Judge WESTCOTT, make

provision for the payment of expenses necessary, proper, incidental, or growing out of the law itself, including payment of the persons employed; while experience teaches the wisdom of the constitutional inhibition against including in a General Appropriation Bill, provisions on any other subject. The purpose of such a provision is generally conceded to be to prevent including in bills appropriating money to carry on the government of the State, measures foreign to that purpose, and by taking advantage of the necessities of the State, force the legislature to adopt them, or stop the entire machinery of the government for want of funds to carry it on.

The constitution of most if not all the States have provisions similar to Sec. 30, Art. 3 of our Constitution, but we have been able to find a decision from only one State, Oregon, whose constitutional provision is identical with ours. Other decisions relating to constitutional provisions differing somewhat from ours, have been cited which though interesting are not sufficiently in point to be guiding.

Section 7, Art. 9 of the Oregon Constitution, provides, "Laws making appropriations for the salaries of public officers and other current expenses of the State shall contain provisions upon no other subject." That is the exact language of the provision of our Constitution, and an attack was made on the Workmen's Compensation Act, on the ground that it was in contravention of this provision of the Oregon Constitution. So much was said by the court that is applicable to the instant case, both as to the law and legislative practice, that we quote at length from the opinion: "The evident purpose of this provision was to prevent matters foreign to the general purpose of appropriation bills being attached

to them as riders, thereby taking advantage of the necessity of the State for money to defray its current expenses and to pay its officers to pass measures that perhaps would otherwise have been defeated. The instant act is not primarily an act to appropriate money to pay salaries or other current expenses. It is not an appropriation bill in the sense that bills providing for general current expenses or salaries of the constitutional officers of the State are such. We have been cited to no case, in this State or elsewhere, where a provision similar to the one at bar has been construed in accordance with counsel's contention, and in this State contemporary legislative construction has been the other way. Thus at the first regular session of the Legislature held after the adoption of the Constitution, we find an act, entitled 'An Act for the appointment of a librarian and defining his duties' (Laws 1860, p. 64), was passed, creating the office of State Librarian, defining his duties, prescribing the hours which he should keep the library open, and appropriating $400 annually for the purchase of books and $150 annually for his salary. The president of the Senate, the Speaker of the House, and many members of both houses had been members of the constitutional convention. From that time to the present it is safe to say that there has not been a session of the Legislature where similar acts have not been passed. Some of them are: The Food and Dairy Commission Act; the Immigration Commission Act, passed 1885; the Fish Commission Act, in 1887; the State Board of Horticulture Act, in 1895; the Bureau of Labor Statistics Act, in 1903; the act creating the office of state engineer, and providing a water code, in 1905; the Bank Examiner Act, the Railroad Commission Act, and the Sheep Inspector Act, in 1907; the act creating the office of insurance

commissioner and a fund known as the 'insurance fund,' and the act creating our present water board, in 1909; the act creating the State forestry board, and the act providing for the construction of a branch insane asylum in Eastern Oregon, in 1911; the act providing for a State industrial school for girls; an act creating an Industrial Welfare Commission, an act creating the State highway commission; and an act creating the State live stock sanitary board, in 1913. Most of these acts fixed the salary or compensation of the officers designated to carry out their purposes and appropriated the money necessary to pay such salaries and to accomplish the general objects for which the law was enacted. An examination of the late session laws of other states having identical or similar provisions in their Constitutions shows that the same legislative practice has been pursued in these jurisdictions, so that it may be said practically the uniform contemporaneous construction of this section of the Constitution is that it does not prohibit the Legislature from passing an act designed to effect a particular purpose and in the same act to provide the funds necessary to accomplish that purpose." Evenhoff v. State Industrial Acc. Commission, 78 Ore. 503, 154 Pac. Rep. 106.

Judged by a long line of enactments by the legislature, that coordinate branch of the government has placed on Section 30, Art. 3 of our Constitution a construction in accord with Mr. Justice WESTCOTT's opinion, that a specific provision for the payment of expenses necessary, proper, incidental or growing out of a law itself, including provisions for the payment of persons employed is not prohibited by the constitution, for ever since it went into effect in 1887, laws have been passed creating

offices, prescribing the powers and duties of the incumbents, and making appropriations for their salaries. In both the Special and the Regular sessions of the Legislature of 1889, there were several members who were delegates to the Constitutional Convention that ordained Section 30, Art. 3. At the former the State Board of Health was created by an act which enumerated its provisions, defined its duties, and provided for a State Health Officer who should receive a salary of $3,000.00 "out of funds hereinafter provided, together with his actual travelling expenses." The regular session of 1889 created the office of State Chemist and Inspector of Fertilizers, and provided for their salaries. Since then the legislature has from time to time given its sanction to such acts, among which are the following: Providing for the office of Inspector of Feeding Stuffs and Fertilizers; for Bank Examiners; State Geologist; Inspectors for Chemical Division of the Agricultural Department; Inspector of Nursery Stock; Rural School Inspectors; State Labor Inspector; Hotel Commission; Shell Fish Commission; State Highway Commission; State Board of Examiners of Teachers; Livestock Sanitary Board, and State Marketing Commissioners. The last three were enacted in 1917. All of these laws make appropriations for salaries and expenses, and some have never been provided for in the General Appropriation Bill, or other special law. None, however, include "other current expenses of the State."

The construction placed by the legislature on this provision of the constitution is entitled to weight with the courts, when there is doubt as to the constitutionality of a law. This does not mean, however, that if the legislature clearly violates a constitutional provision, the frequent repetition of the wrong will create a right;

but as was said by Mr. Justice Johnson in Ogden v. Saunders, 12 Wheat. (U. S.) 213, text 290, "It proceeds upon the presumption that the contemporaries of the Constitution have claims to our defference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the Constitution, and of the sense put upon it by the people when it was adopted by them." Judge Cooley in his work on Constitutional Limitations, (7th ed.) p. 102, says: "But where there has been a practical construction, which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which it is not easy to resist. Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the Constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention. And where this has been given by officers in the discharge of their official duty, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight."

In Bloxham v. Consumers' Electric Light & St. R. Co., 36 Fla. 519, 18 South. Rep. 444, it was held that "A practical construction of a statute by a governmental department while not of such high authority as a judicial interpretation of the act, is, when not in conflict with the Constitution or the plain intent of the act, of great persuasive force and efficacy." · All the acts of the legislature which we have mentioned herein,

37—Vol. 74

are of the same general character as that under consideration. They provide for the performance of certain duties by officers or other persons, and make appropriations for their salaries and expenses, and they have been recognized by the executive branch, by making appointments, thereunder and paying the salaries and expenses provided for; in most instances without any provision being made therefor in the Gen. Appropriation Bill. Thus, to guide us to some extent, we have the interpretation put upon such laws by the legislative and executive branches of the government. As was said, however, in the case of Evenhoff v. State Industrial Acc. Commission, *supra*, "While such construction will not be permitted to overturn and render nugatory a clear provision of the Constitution, in cases where the meaning of a clause in the instrument is capable of two interpretations, it is entitled to great weight." In the case under consideration we have no doubt about the validity of this act, and the construction placed on it by the legislative and executive departments of the government confirms, rather than influences our conclusion.

We are strongly of the opinion that this act is not in contravention of Section 30, Art. 3 of the Constitution, because it is not a law "making appropriations for salaries of public officers and other current expenses of the State," but is one inaugurating a new governmental policy in the assessment of property for taxes, and is a comprehensive scheme embracing the entire State and affecting the taxation of all property in the State. The matter of appropriations for carrying the law into effect is but a small part of the great purpose of the act.

The appellee next contends that because the act makes a continuing appropriation it is in contravention of

Section 2, Art. 9 of the Constitution which says that "The legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year." We fail to find in this provision of the Constitution any inhibition on the power of the legislature to make continuing appropriations. Most if not all the laws hereinbefore mentioned contained continuing appropriations, and the power of the legislature to do this having been sustained in the case of State v. Southern Land & Timber Co., *supra,* it disposes of this contention.

The judgment is reversed.

TAYLOR, WHITFIELD, ELLIS, J. J., and WILLS, Circuit Judge, concur.

WEST, J., disqualified.

ELLIS, J., Concurring—I think that the word "Journal" as used in Section 12 of Article III of the Constitution which requires each house of the legislature to keep a journal of its own procedings and to publish the same and as used in Section 17 of the same article which requires the vote on the final passage of every bill or joint resolution to be taken by yeas or nays and entered on the journal of each house, means the record of the procedings of each house as it is daily made and published in pamphlet form and placed each morning upon the desks of the members for correction and approval.

The bound copies of the journals which the contractor for the public printing is required under Sections 657 and 660 of the General Statutes to print and bind and deliver to the Secretary of State for distribution to the officials named therein are not verified copies, nor can

they be said to be reprints in the sense that they are new impressions from the same moulds or forms upon which the journals or daily pamphlets were printed.

. The burden of showing, that an Act of the Legislature which has been duly signed by the presiding officer of each house and by the Secretary of the Senate and the Clerk of the House of Representatives and become a law with or without the approval of the Governor as shown by the record of official acts of the Legislative department as the same are kept by the Secretary of State as required by Section 21 of Article IV of the Constitution ,is upon the person who asserts that the act did not pass in the manner prescribed by the constitution.

Such has been the holding of this court since the case of State *ex rel.* Markens v. Brown, 20 Fla. 407, was decided, in which Chief Justice RANDALL said: "If the journals show conclusively that any material portion of a bill as passed was omitted in the enrolling, so that it may be considered that the act as approved was not passed by the Legislature and does not express the legislative will, the act as approved at least to the extent that it is affected by the omission must be held invalid. This is a rule now well settled by the American Courts. The Constitution (1868) requires the keeping of journals of their proceedings by the respective Houses of the Legislature; and these Journals *are received as evidence of such proceedings* (italics mine). When an act is duly approved and published it is *prima facie* a law; but if the Legislative Journals show that instead of being passed it was defeated, or that it is not the same that was passed it is not a law."

This having been the law of the State for more than thirty years and having decided that the daily printed

pamphlets showing the legislative proceedings of each house constitute the journals of that house, the burden was upon the appellee to show by the journal of one of the houses that the act, Chapter 6500 laws of 1913 did not pass in the manner and according to the requirements prescribed by the constitution, in order to sustain the first point made by him in his attack upon the validity of the act.

This burden was not carried by the appellee. He sought by the introduction of the bound copies of the journal of the Senate of the Session of 1913 to throw the burden upon appellants of showing by the journal of the Senate that the bill in question did pass. Even if the bound journals may be considered as secondary evidence of the daily proceedings of each house, a proposition which I am not prepared to accept as law, there was no effort to show that the "Senate Journal" could not be produced and therefore no ground for the introduction of secondary evidence was laid.

The appellee having therefore failed to show by the "Journal" of either house of the legislature of the Session of 1913 that the act did not pass, the *prima facie* validity of the act was not overcome.

I also concur in the conclusion reached as to the second point.