STATE, *ex rel.* CARY D. LANDIS, Attorney General, v. ULY
O. THOMPSON.

164 So. 192.
Opinion Filed November 14, 1935.

562

*Cary D. Landis,* Attorney General, *H. E. Carter,* Assisant, *Cockrell & Cockrell, Francis P. Fleming, E. J. L'Engle, L. R. Milton, P. H. Odom, H. T. Cook, Hull, Landis & Whitehair* and *MacWilliams & Upchurch,* for Relator;

*D. H. Redfearn, R. H. Ferrell, Thomas H. Anderson, H. H. Eyles* and *E. F. P. Brigham,* for Respondent.

PER CURIAM.—This case is before us on demurrer to amended return and motion for a writ of ouster, the return to the contrary notwithstanding, after opinion and judgment rendered herein on September 18th, 1935, reported 163 Sou. 270, in which the judgment was that we sustained the demurrer with leave to amend respondent's return in particulars not inconsistent with the holdings of that opinion.

We hold the allegations of the return to be inconsistent with the opinion referred to in that it is sought in this return to collaterally attack the contents of what appears on its face to be the legislative journals in which are recorded the proceedings of the Legislature of Florida.

In Amos v. Gunn, et al., 84 Fla. 285, 94 Sou. 615, we said:

"An allegation in a bill of complaint attacking the validity of an Act of the Legislature that a certain document on file in the office of the Secretary of State purporting to be/ an official Act of the Legislature and purporting to be duly enrolled and signed by the presiding officers of the two Houses of the Legislature and their respective clerks and duly approved by the Governor, is not in fact an Act of the Legislature because it was never presented by that body to the Governor, nor signed by the presiding officers and clerks of the two Houses of the Legislature while that body was in session, is not susceptible of proof by parol evidence or other means aliunde the legislative journals or other public records in the office of the Governor or Secretary of State. And such allegation, standing alone, which does not also affirm the existence of a public record in the office of the Governor or Secretary of State which shows the alleged defects to exist is not admitted by demurrer to the bill of complaint."

. "A document on file in the office of the Secretary of State, purporting to be an enrolled bill duly passed by the Legislature and duly signed by the presiding officers and clerks of the two Houses of the Legislature is *prima facie* a valid Act of the Legislature and may not be impeached by any evidence of less dignity than a public record of an official executive or legislative Act."

In that case we also held:

"The Court has no power to take judicial knowledge of facts existing *in pais* depending upon parol testimony to establish them, that will destroy the faith and credit which the law requires to be given to a public record, and leave the officer, whose duty, or power, in law it was to make the record, under suspicion of fraudulent conduct in the making of it."

"Judicial knowledge is confined to the record when an official act of the legislative or executive department is called in question and such record is authentic and complete in itself."

The holding in that case, however, does not mean that on direct attack the Court may not inquire into the question as to whether or not the document which purports to be the record of the legislative proceedings is in truth and in fact a record of such proceedings. If it should appear in a proper suit instituted for the purpose of questioning the *bona fides* of the purported record that the purported record contains recitals of legislative action which in truth and in fact did not occur during the legislative session it became *functus officio,* the false entries may be expunged upon the ground that it is shown that when the body of men which had constituted the membership of the Legislature of Florida took the action assaulted they had ceased to be a legislative body by operation of the Constitution, or otherwise,

and were, therefore, without jurisdiction to function as a legislative body, when it is further shown that there was neither legislative nor constitutional authority for including in the record the items which transpired outside of legislative authority.

In other words, a resolution duly adopted by each branch of the Legislature authorizing the Secretary of the Senate and the Chief Clerk of the House of Representatives to prepare the Journal of the last day of the session so that the same would speak the truth as to what transpired on the last day of the session would not authorize those officers to include something in the Journal that did not transpire on the last day of the session.

· For the reasons stated, the demurrer will be sustained without prejudice to the respondent to institute any proceedings which he may be advised to be proper and necessary to correct the legislative records involved, should they be shown not to speak the truth, and judgment awarding the writ of ouster is withheld until the further order of this Court.

So ordered.

WHITFIELD, C. J., and TERRELL, BROWN, BUFORD and DAVIS, J. J., concur.

DAVIS, J. (concurring).—I concur without reservation in the foregoing *Per Curiam* opinion, but think the following observations of my own conception are not inappropriate to be here set forth in connection with the subject discussed.

The amended return of the respondent, filed pursuant to the leave given heretofore by this Court (State, *ex rel.* Landis, v. Thompson, 120 Fla. 860, 163 Sou. Rep. 270) is as follows:

"1. Respondent amends his original return by striking paragraph 8 thereof and the amendment thereto and substi-

tuting in lieu thereof the following, to be numbered paragraph 8:

"8.

"Respondent alleges that a judgment of ouster should not be issued against him, for the reason that Senate Bill No. 4, now known as Chapter 17085, of the General Laws of Florida of 1935, was not in fact passed by the House and Senate and its enactment fully completed before the legislative day of May 31, 1935, had run its course under the limitations of Section 2 of Article III of the Constitution, in that said bill was not in fact passed, enrolled, and signed, by 'the presiding officers of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives,' prior to midnight of May 31, 1935, as required of Article III, Section 17, of the Constitution of Florida.

"Respondent further alleges that the members in attendance upon the Legislature of the State of Florida upon the 31st day of May, 1935, illegally designing to extend the session of the Legislature of the State of Florida beyond the limit of sixty days as provided by the Constitution, knowingly refrained from moving for the adjournment of the session of said Legislature on the said date, and, thereafter, without protest, knowingly continued to participate in the conduct of supposed legislative business pending before such legislative body for a period of approximately twenty-eight hours after twelve o'clock midnight of May 31, 1935; that said legislators in pursuance of such illegal acts, and as a means of carrying the same into effect adopted the subterfuge of stopping the clocks of the House and Senate at the hour of twelve o'clock noon on May 31, 1935, or shortly before that time, and caused the Journals of the House and Senate to be falsified by showing the adjourn-

ment of both House and Senate at twelve o'clock noon on said date, while in truth and in fact said Legislature attempted to remain in session trying to conduct legislative business as if legally in session until approximately four o'clock Sunday morning, June 2, 1935, which is approximately twenty-eight hours after midnight of May 31, 1935; that said facts are matters of general knowledge, of which this Court should take cognizance; that the Journals of the House and Senate were so falsified in pursuance of said acts of said members of the Legislature in an effort to extend the session of the Legislature beyond the time limit fixed by the Constitution; that on and after the hour of twelve o'clock of the 31st day of May, 1935, the said Legislature was not legally in session, and the purported records of the House and Senate of proceedings had after such time are not the records of the Legislature of the State of Florida, but are only the purported records of an aggregation of individuals, and are without force and effect in law.

"2. Respondent further amends his answer by adding the following paragraph, to be known as paragraph 8-a:

"8-a.

"Respondent alleges that, even if the Supreme Court of Florida should hold that said Senate Bill No. 4, now known as Chapter 17085 of the Laws of Florida of 1935, was legally passed and is now a valid law, respondent would still be entitled to hold his office as one of the judges of the Circuit Court of Dade County, Florida, and should not be ousted, for the reason that judges for the Eleventh Judicial Circuit of Florida, provided for under said Senate Bill No. 4, were not appointed by the Governor and confirmed by the Senate prior to the expiration of the 1935 session of the Legislature at midnight of May 31, 1935, but that certain judges for said circuit were appointed and said aggregation of in-

dividuals, attempting to act as the Senate of the State of Florida, after the time of adjournment had passed, attempted to confirm said judges, but said judges were not legally confirmed; that the records of said Senate showing the appointment of said judges to have been confirmed prior to midnight of May 31, 1935, are false and untrue, and were falsified in pursuance of the illegal acts heretofore pleaded in this amendment.

"3. Respondent further amends his original return by adding a new paragraph to said return, to be known as paragraph 30 and to read as follows:

"Respondent respectfully shows that he holds a commission as judge of the Circuit Court of the Eleventh Judicial Circuit under Chapter 9163 of the Laws of Florida of 1923, approved May 28, 1923; that said commission runs in cycles of six years; that the Honorable A. J. Rose, who was acting as one of the judges of the Eleventh Judicial Circuit resigned in January, 1930, and respondent was duly appointed and qualified as his successor on the 27th day of January, 1930, and confirmed by the Senate, for the unexpired term theretofore held by the Hon. A. J. Rose; that the commission thus held by respondent did not expire until June 6, 1935; that no successor to the office so created by the Act of 1923, and so held by this respondent, has been appointed by the Governor and confirmed by the Senate, nor has his office been legally abolished; that respondent is now holding over and acting in pursuance of a continuing commission and, by reason thereof, is exercising the functions, franchises, jurisdiction and power as a circuit judge of the Eleventh Judicial Circuit of Florida, because no successor to him has ever been appointed by the Governor of the State of Florida and confirmed by the Senate, as provided by the Constitution and the laws of the State of Florida.

"Respondent alleges that he holds office under a cycle which did not expire until June 6, 1935, after the Legislature of 1935 had adjourned, and that no one was appointed and confirmed to succeed him.

"Respondent further alleges that the Legislature of the State of Florida, at the extraordinary session in 1925, enacted Chapter 11366 of the Laws of Florida, approved November 30, 1925, which provided for another additional judge of the Eleventh Judicial Circuit; that the Legislature of the State of Florida, at its session in 1927, enacted Chapter 11887 of the Laws of Florida, approved June 6, 1927, in which another additional judge for the Eleventh Judicial Circuit was provided for; that said two additional judgeships likewise ran in cycles and no successors for respondent or for said additional judges were appointed by the Governor and confirmed by the Senate of the State of Florida, and for that reason respondent and the other judges of the *old* Eleventh Judicial Circuit are still holding their offices by virtue of their old commissions until their successors have been appointed by the Governor and confirmed by the Senate."

Now the fact is that either the 1935 Legislature was a dead Legislative body on June 1, 1935, or Section 2 of Article III of the Constitution was dead on that date. This is so, because the Constitution either means that no regular legislative session must extend beyond sixty days *by the calendar,* or it does not. The limited sixty days' duration of the regular sessions of the Legislature is thus a matter wholly beyond the *jurisdiction* of the Legislature to enlarge, as it is a matter not controlled by any mechanically actuated scheme for the admeasurement of time, such as are the Legislature's daily sittings. On the contrary, the number of days a Legislature may sit is controlled entirely by the

calendar and the Constitution itself as much so as the cal-
endar and the Constitution operate to fix the *date of the be-
ginning* of each and every regular session of the Legislature
as being inevitably and in every instance the first Tuesday
after the first Monday in April of each odd numbered year.

To put it another way, and more succinctly, the power
of .the Legislature to stop its clocks does not amount to a
right to stop the calendar.

It therefore follows that whenever it is shown that the
Legislature has attempted to exceed its jurisdiction as a
Legislature by continuing in session beyond its allotted con-
stitutional total number of sixty days, the conclusive legal
presumption that ordinarily attaches to legislative records
made up by the Legislature while in constitutional session
may be affected.   This is true because the conclusiveness of
the legal presumption in favor of the legislative records ob-
viously does not attach to records of a "rump" session of the
Legislature as distinguished from a regularly convened con-
stitutional session.

No clerical officer of the Legislature has the right to
create a journal of legislative proceedings other than as a
record of what the Legislature actually did during the con-
stitutional period of time it was entitled to sit as a Legis-
lature and in that capacity keep a journal at all.   As was
held in Amos v. Moseley, 74 Fla. 555, 77 Sou. Rep. 619, L.
R. A. 1918-C 482, the "journal" of the Legislature is the
*daily* record of what it *daily* does as Legislature.   When
published *by the Legislature* and distributed *by it* as its of-
ficial *journal,* the daily printed journal pamphlets pur-
porting to be the "journals" of the Legislature, whether
correct or not, cannot be attacked in a judicial proceeding
and impeached by the proffer of evidence *in pais,* because
the Courts are required to judicially notice legislative "jour-

nals" as importing absolute verity insofar as they appear on their face to have been made by the Legislature itself within the terms of Section 12 of Article III of the State Constitution. Gwynn v. Hardee, 92 Fla. 543, 110 Sou. Rep. 343, and cases therein cited.

However, in a litigated case involving the interests of private parties, the courts may be compelled to decide whether or not a particular measure purporting to be a legislative enactment was ever passed by a legislative body having jurisdiction (at the time of its passage) to act as a Legislature and in that capacity to enact valid laws. See discussion in Clugh v. Curtis, 134 U. S. 361, 10 Sup. Ct. 573, 33 L. Ed. 945.

So, while the Courts, as such, have no authority or right to invade the province of a co-ordinate branch of government by undertaking to interfere with the proceedings or records of the Legislature, or to regulate the official conduct of the duly authorized clerks of the respective branches after the Legislature's final adjournment, whether in completing the legislative journals or otherwise so long as the legislative officials are merely obeying the Legislature's rules, resolutions and commands (Fox v. Harris, Senate Clerk, 79 W. Va. 419, 91 S. E. 209) the courts do have authority, *when private legal rights are shown to be prejudiced* by unauthorized acts of legislative officials to judicially coerce the clerical officers of the Legislature to stay within the bounds of their delegated authority in making up what purport to be records or journals constructed by such clerical officers and published by them after final adjournment of a legislative session. But in every such instance of exercise of judicial power, the affected legislative officials must be parties to the proceedings.

In this connection it is significant to point out that during

the 1935 regular session of the Legislature, the Legislature did not *itself* purport to make up and approve the official journal of its proceedings for the *last* day of its regular session. On the contrary, it delegated that responsibility to the Chief Clerk of the House of Representatives and to the Secretary of the Senate, with specific directions to prepare the official "journal" for May 31, 1935 (the last day of the regular session) in such manner that "the said journal as finally incorporated into the bound volume, would present a truthful and accurate account of the proceedings of the two houses." See 1935, House Journal (House Concurrent Resolution No. 30) page 1498.

But even so, whether or not what purports to be the "journal" of May 31, 1935, of the House of Representatives, and of the Senate, is in truth and in fact the "journal" of what happened on that day alone, or a combination journal of what happened on May 31, 1935, *and* on June 1, 1935, and June 2, 1935, as well, cannot on principle, in the absence of authority, be collaterally established or inquired into in this case, because so long as the questioned journals purport to stand as conclusive records of the Legislature, *valid on their face, they must be judicially noticed as such* by the Courts in all proceedings not directly involving an adjudication as to the verity of such records. Judicial notice not only supplies the want of evidence to establish the fact judicially noticed, but necessarily precludes all attempts to proffer contradictory evidence to refute what the court holds that it must judicially know in the circumstances.

The Clerks of the two Houses of Legislature are undoubtedly beyond reach of judicial processes with respect to what they may have recorded under the suggestion and direction of the Legislature *while it was in constitutional session.* But as to matters that may have been recorded by

them, concerning matters occurring after the constitutional life of the Legislature was ended, the Courts are necessarily empowered to use their appropriate processes to direct the responsible officers to expunge from what purport to be records of the Legislature, all false and extraneous matter that, if left incorporated therein, would come within range of a Court's judicial notice by reason of the mere fact that it stands as a legislative record secure against collateral attack.

Under the Constitution of Florida, the mere enrollment of a legislative bill and its signing by the Governor and subsequent deposit in the office of the Secretary of State, cannot make such bill a law, however fair on its face it may be. State, *ex rel*. Bd. Com'rs Indian River Mosquito Control District, v. Helseth, 104 Fla. 208, 140 Sou. Rep. 655. There must be appropriate legislative journal entries showing the proper introduction and passage of the bill in the prescribed constitutional manner or the bill is a mere *brutum fulmen*. And the courts will so declare in appropriate proceedings when called on to determine whether or not the signed legislative bill ever became a law in the constitutionally prescribed manner laid down for the conversion of mere legislative bills into laws. Freeman v. Simmons, 107 Fla. 438, 145 Sou. Rep. 187.

So while the Courts have no judicial power to control the judgment or discretion of legislative officials in the preparation or publication of legislative journals, even after the Legislature has finally adjourned,* their duty of judicially

---

*In State v. Wilson, 123 Ala. 259, 26 Sou. Rep. 482, mandamus against the Secretary of State to correct legislative Journals was denied, but the right of one prejudiced by a falsely made Journal made up and filed after the Legislature had adjourned was expressly recognized. In Florida the rule has been established in

noticing legislative journals as importing absolute verity when collaterally involved in a litigated case affecting private legal rights, necessarily entitles a litigant, who may be adversely affected by what purports to be a legislative record, to have expunged from such record, and consequently put beyond the range of the Court's judicial notice of his prejudice, any matter that may have been incorporated in a putative legislative record without authority to the Legislature, or by direction of the Legislature acting in excess of its legislative powers.

The duty of keeping legislative records that may adversely affect private legal rights entitled to constitutional protection by action of the Courts predicated on such records implies, it seems to me, the power *ex necessitate rei* on the part of the judiciary to give effective relief to the litigant by using their processes to have the putative legislative record confined to that which is in reality a record that the Legislature possessed the constitutional power to make, or to have made, in the premises.

The respondent's return challenging the correctness of the putative legislative journal of May 31, 1935, has merely laid the predicate for invoking appropriate judicial processes against the record itself which can only be purged of any extraneous matters appearing therein by a requirement that the legislative officials themselves expunge therefrom any entry they may have incorporated therein which was not in truth and in fact the record of a legislative act transpiring

State v. Haskell, 72 Fla. 176, that even where officers would have no right to voluntarily assemble to perform a duty neglected by them, the courts will compel them to do so in the interest of a complainant whose legal rights may have been affected by the officer's failure to perform in the first instance. This distinguishes the final result of the Alabama case from the Florida law on the same subject.

on the legislative day of May 31, 1935. The duty thus resting on the Legislature's clerical officers is in its essence ministerial. It is likewise continuing in character, and remains enforceable so long as the Legislature's clerical officers retain their official status as such, and so long as their responsibility as such clerical officers can be made capable of being faithfully performed by means of judicial processes issued against them to coerce the faithful performance of what the Constitution commands shall be done in the way of preparing and publishing the legislative "journals."

Senate Bill No. 4 (Chapter 17085) cannot be destroyed as a whole as claimed in the petition for a rehearing, merely because a provision of it has been held unconstitutional in our previous opinion. This is so because Section 45 of Article V of the Constitution imposed the direct mandatory duty on the Legislature to pass some sort of redistricting Act covering the State's Judicial Circuits. Therefore, such constitutional duty, insofar as the Legislature may have actually performed it though any valid part of the legislative Act the Legislature did pass, cannot be defeated by the application of the mere rule of judicial construction that would otherwise apply where an Act of the Legislature is found to be partly unconstitutional and the Court cannot say that the Act would never have been passed with the unconstitutional provisions eliminated therefrom, as was the situation in State v. Jones, 79 Fla. 56, 84 Sou. Rep. 84, and like cases.

How can the Supreme Court say in this case that the Legislature would have violated its constitutional duty by refusing to pass any recircuiting Act at all, merely because it might find itself constitutionally prohibited from compelling the Governor to name Circuit Judges according to

an unconstitutional provision of the Act it did actually pass?

The rule of State v. Jones, *supra,* is necessarily limited in its application to those cases wherein the Legislature has a constitutional option to refuse to legislate at all on a particular subject, unless its legislative object can be accomplished in a particularly specified way. Here the Legislature had no option to entirely refuse to legislate on the subject of compliance with Section 45 of Article V of the Constitution. So we must presume that valid parts of the Act it did pass are *ex proprio vigore* separable from the invalid parts. To hold otherwise would impute to the Legislature an intent to defeat what it was its mandatory duty to do in compliance with the Constitution, or namely, to pass the valid portions of Senate Bill No. 4, even if the unconstitutional portions had to be eliminated therefrom.

The petition for a rehearing is therefore not well taken on the last stated proposition.

WHITFIELD, C. J., and TERRELL, BROWN and BUFORD, J. J., concur.