BARFIELD, Judge.
By this appeal we are called upon to determine what machinery and equipment is exempt from sales tax pursuant to section 212.08(5)(c), Florida Statutes (1983), at the St. Johns River Power Park, and what effect, if any, section 212.051, Florida Statutes (1983), may have on limiting exemptions otherwise available under section 212.08(5)(c).
Florida Power & Light Company and Jacksonville Electric Authority sought and obtained from the Department of Revenue a declaratory statement pursuant to section 120.565, Florida Statutes (1983), concerning the section 212.08(5)(c) exemption from Florida sales tax on purchases of certain items to be used in the construction of the St. Johns River Power Park (SJRPP or the plant). Appellants are co-owners of the plant. The petition for declaratory statement states that the plant
[Cjonsists of two 612 megawatts coal-fired electric generating units together with all necessary apparatus, equipment, materials and appurtenances necessary and appropriate for satisfactory operating of the units. Each of the units at SJRPP will include a steam generator, turbine generator, air quality control system, circulating water system, and associated equipment for each major component. Facilities common to each unit are the chimney, switchyard, fuel and materials handling system, and the water and waste management systems. External to the rail loop is an area of land for the potential disposal of solid waste from the by-products of combustion and flue gas desulfurization and for environmental buffer areas.
Appellants claimed an exemption for 96 items, only 16 of which are at issue on appeal.. Those 16 items fall into three categories: (1) coal handling equipment; (2) equipment required by state and federal laws; and (3) electrostatic precipitators.
The facts concerning the construction and operation of the plant are not in dispute. The plant contains a power block consisting of two boilers, two turbine generators and associated auxiliary equipment. Each boiler and turbine generator is paired with an electrostatic precipitator and a flue gas desulfurization system. Coal handling equipment and conveyors connect the coal unloading area (where railroad cars deposit *1352 the coal), the coal storage areas, and the power block.
The process begins with coal brought to the plant by train, on tracks owned by appellants. A permanent railroad track circles the plant. When operating at full capacity, each of the plant boilers will burn 200 tons of coal per hour. On the average, two trains of 100 cars will be required every day to supply coal to the plant. In the coal unloading area, coal cars are rotated upside down and the coal dumped into a silo beneath a section of the railroad track. Conveyor belts at the bottom of the silo move the coal above ground to the coal handling area. The conveyor belts are enclosed to contain dust from the coal, and have sprinkler systems as a fire protection measure.
In the coal handling area, the coal is crushed into smaller pieces and sent to the coal storage area. As coal is needed, a conveyor takes it from the active reserve pile, through the coal handling area and past the boilers, then deposits it into the silo bank located above each of the boilers. The coal drops from the bottom of each silo through feeders into a pulverizer, which crushes the coal into a fine powder. At that point, noncombustible pyrites are separated out and only carbon goes to the boiler. After separation, the pyrites pass through a crusher and are sluiced to storage silos on the eastern edge of the site. From there trucks haul the waste to a landfill.
After pulverization, forced air blows the powdered coal into the firing alley of the boiler furnace, where it burns instantly. The heat created by the burning coal turns water in the boiler tubes to steam, which then flows from the boiler through the turbine, causing the turbine to turn at a high speed. The turbine drives the generator to produce electricity.
Burning coal leaves an ash residue of 10-20% by weight. Of the total residue, approximately 20% becomes bottom ash which falls through the open bottom of the boiler into water, where it cools and is then crushed and sluiced to storage silos for disposal. The other 80% of the residue is fly ash. Induced draft fans located above the precipitator draw the exhaust gases, including the fly ash, upward out of the firing alley of the boilers. The boilers will not function unless air is forced into the furnace and exhaust gases are drawn out.
The heavier particles of fly ash settle on the economizer tubes at the top of the boiler. Soot blowers systematically blow the ash off the economizer tubes into hoppers, from which the ash is moved through pneumatic pipes to storage silos to await disposal. The finer particles of fly ash are drawn out of the boiler and into the electrostatic precipitator where they are caught and then fall into hoppers. From the hoppers the fly ash, like the economizer ash, moves through pneumatic pipes to storage tanks. The remaining exhaust gases first pass through the precipitator and fans, and then flow into the scrubber. After the scrubber removes the sulfur dioxide, the exhaust gases pass out into the atmosphere.
While the precipitator prevents the discharge of particles to the environment, and is therefore required by federal regulations, it also maintains the induced draft fans and prevents ash from escaping the stack and literally burying the plant. In other words, a fly ash collection system is prudent practice for the efficient functioning of such a plant, regardless of federal environmental regulations. Likewise, the economizer ash system is necessary for the operation of the boilers, since the heavier particles of fly ash would otherwise accumulate and cause an outage. Unless bottom ash is disposed of in some manner, it will back up into the entire system, causing it to malfunction.
The declaratory statement issued by the Department of Revenue denied exemption for the 16 items at issue on the grounds that they were either not “necessary in the production of electrical or steam energy” as the department construed that statutory *1353 language from section 212.08(5)(c),[1] or that they were denied exemption by section 212.051,[2] even though the items might otherwise be “necessary in the production of electrical or steam energy.” We do not accept the Department’s construction and resulting determination. The Florida Supreme Court set out the test for review of an agency’s construction of a statute which it is charged to administer in State ex rel. Biscayne Kennel Club v. Board of Business Regulation, 276 So.2d 823, 828 (Fla.1973):
Such administrative construction of the statute by the agency or body charged with its administration is entitled to great weight and will not be overturned until clearly erroneous.
If the Department has misconstrued the intent of the Florida Legislature in enacting section 212.08(5)(c), its construction of that statute will be clearly erroneous.
Both parties have argued that the language of the statute is ambiguous and that this court should look to other jurisdictions having similar but not identical laws in effect at the time the Florida Legislature adopted the statute in question. When we attempt to do so, we are immediately confronted with conflicting concepts. One is the “Ohio Rule,” which is very restrictive in its exemption of equipment used in similar circumstances.[3] The other is the “integrated plant theory.”[4] When we couple these conflicting theories with various dictionary and case law definitions promoted by the parties, we find that we are being asked to speculate on the legislative intent by use of conflicting presumptions, inferences, and in some instances, good old fashioned “guess work.” Given that choice alone, the court would apparently be compelled to accept the agency’s construction, because it could not be said to be either unreasonable or “clearly erroneous.” What both sides have failed to disclose on the record, however, is whether the public records of Florida contain an expression of the intent of the Florida Legislature in enacting the statute in question.
Independent review of public records covering the history of this legislation suggests that the Department’s interpretation of legislative intent may be incorrect. House Bill No. 1506 originally dealt only with the expansion of Florida Statutes section 212.08(7)(o) to exempt from tax the sale of recycled oil or waste oil, or solid waste material for use as a fuel.[5] On May 27, 1980, House Bill No. 1506 was amended by the Senate Committee on Ways and Means to include the language which is *1354 now contained in section 212.08(5)(c).[6] The sponsor of the amendment explained that since the legislature was extending the exemption to fuels other than residual oil, the amendment would encourage the building or the converting of systems to use alternative fuels. The purpose of the amendment was to encourage the construction of these alternatives to residual oil burning systems by making them financially attractive to construct.[7] Nowhere in the committee’s discussion of the purpose of the amendment was there any suggestion of limiting the exemption to selected component parts of the system. The committee’s discussion sounds much like the “integrated plant theory” proposed by appellant, although there is no indication that it was designed by analogy to that theory. The passage of the bill out of committee, and through the Senate and the House, was thereafter uneventful. The “integrated plant theory”, coupled with the committee discussion of the amendment in the Florida Legislature, suggests to us that the Department of Revenue’s construction of the statute may be erroneous.
The role of the judiciary in statutory construction has been chronicled and exhaustively addressed by the Florida Supreme Court.[8] What is unclear is the permissible extent of independent investigation by appellate courts in the area of legislative history and intent. It is certain that the Journals of the House and Senate may be judicially noticed to furnish insight into the legislative intent.[9] When investigation beyond the journals appears appropriate, it is our view that the correct practice and procedure is to give way to the evidentiary character of legislative proceedings and require close scrutiny by the factfinder under chapter 90, Florida Statutes.[10] Public records and reports are admissible as an exception to the hearsay rule, section 90.-803(8), provided they are authenticated, section 90.901, by a custodian, sections 90.-902(4) and 90.955. Official actions of legislative departments of the state, such as those considered above, may be judicially noticed, but such notice should be consistent with the provisions of section 90.203, or when taken by the court on its own motion, consistent with section 90.204.
We next turn our attention to the effect of section 212.051 on the exemption otherwise granted by section 212.08(5)(c). The Department of Revenue reasons that section 212.051, first enacted in 1969, operates to preclude from exemption any equipment which functions to control pollution, no matter what other reasonable explanation of legislative intent might attach to a later legislative enactment. A reasoned analysis of the legislative history surrounding this statute should demonstrate to both parties the pitfalls inherent in the argument that judicially created presumptions and inferences concerning legislative conduct and intent, insofar as they serve the particular party’s purpose, are virtually immutable and irrebuttable.
In 1967, as part of the Florida Air and Water Pollution Control Act, the Florida *1355 Legislature passed chapter 67-436, section 25(6), Laws of Florida, later numbered section 403.241, Florida Statutes (1967), which provided a sales tax exemption for pollution control equipment. The stated purpose of the exemption was to soften the blow caused by the tremendous capital outlay occasioned by compliance with the act. In 1969, section 403.241 was renumbered section 193.621(6) by chapter 69-55, sections 1 and 2, Laws of Florida. Chapter 69-222, section 22, Laws of Florida, was enacted during the same legislative session, later numbered section 212.051, Florida Statutes (1969). The section numbers of chapter 69-222 and the numerical sequence of the statutes addressed in the act suggest that it was a late addition to the act. Appellants so argue without any citation of legislative history or authority. The legislature probably intended to eliminate the exemption created by chapter 67-436, section 25(6), Laws of Florida, but it wasn’t until 1971 that it specifically addressed the repeal of section 193.621(6) by enacting chapter 71-355, section 33, Laws of Florida. The Florida Legislative Printing Committee Note states, “This subsection was superseded by § 212.051, created by § 22, ch. 69-222.” If we accept appel-lee’s argument that the legislature is always mindful of its past acts and purposeful in its actions, why then was chapter 71-355, section 33 and its note necessary? We think the circumstances described in this chronology belie the omniscience ascribed to the Florida Legislature by appel-lee.
With the repeal of section 193.621(6), section 212.051 was left standing alone as a bastion against intrusion into the financial coffers of the state by any exemption for pollution control equipment. But in 1971 there was no “provision to the contrary” that we can find anywhere in the Laws of Florida, so that section 212.051 served no purpose in the law. Because it is beyond the constitutional power of one legislature to bind another, the statutory provision could serve no anticipatory purpose to block future exemptions. Daytona Beach Racing and Recreational Facilities District v. Volusia County, 372 So.2d 419 (Fla.1979); Straughn v. Camp, 293 So.2d 689 (Fla.1974). Section 212.051 thus remains a law without a purpose.
We hold that section 212.051, Florida Statutes (1969), is not a bar to exemption from sales tax of pollution control equipment mandated by law to be incorporated into a facility built for the production of electrical or steam energy. We construe section 212.08(5)(c), Florida Statutes (1983), to include such pollution control equipment as “necessary in the production of steam or electrical energy”, notwithstanding that a plant could theoretically produce electrical or steam energy without legally mandated pollution control equipment. No matter how theoretical the physics of producing steam or electrical energy, in reality no equipment or machinery in Florida is going to produce electricity without the mandated pollution control equipment.
The denial of exemptions by the Department of Revenue is REVERSED and these cases are REMANDED to the Department of Revenue for further proceedings to determine the legislative intent in the enactment of section 212.08(5)(c), Florida Statutes (1983), consistent with this opinion.
ZEHMER, J., concurs.
WENTWORTH, J., dissents with written opinion.

. The Department maintains the position that the plant can be broken down into component parts, and those component parts further divided into those which are intrinsically necessary to make electricity and those which only serve to make the plant practically functional. The Department exempts only those components which are intrinsically necessary. For example, item 38 in Exhibit B, incorporated into the declaratory statement, discusses the furnace bottom ash system:
The taxable portion begins immediately after the molten slag passes through the grinders and begins its journey to the storage silos since this process is not necessary in the production of steam.

. For example, item 58 of Exhibit B to the declaratory statement taxes the electrostatic pre-cipitator, noting:
These items are not producing steam nor are they necessary in the production of steam. The electrostatic precipitator is required by environmental agencies and is designed to meet clean air standards.

. Youngstown Building Material & Fuel Co. v. Bowers, 167 Ohio St. 363, 149 N.E.2d 1 (1958), exempted the actual mixing machinery at a cement plant, but not the machinery used to bring the gravel, water and cement together. However, compare Ohio Edison Co. v. Porterfield, 28 Ohio St.2d 150, 277 N.E.2d 195 (1971), which allowed exemption for an electrostatic precip-itator in a coal burning utility plant.

. Niagara Mohawk Power Corp. v. Wanamaker, 286 App.Div. 446, 144 N.Y.S.2d 458 (N.Y.App.Div.1955), allowed exemption for coal and ash handling equipment at an electric generating plant because it was not practical to break down such a plant into theoretically distinct stages.

. 1980 Journal of the House, p. 189.

. 1980 Journal of the Senate, p. 409.

. Cassette tape of proceedings of the Senate Committee on Ways and Means, May 27, 1980, Division of Archives, Florida Department of State.

. State v. Webb, 398 So.2d 820 (Fla.1981); State Board of Accountancy v. Webb, 51 So.2d 296 (Fla.1951); Amos v. Moseley, 74 Fla. 555, 77 So. 619 (1917); Curry v. Lehman, 55 Fla. 847, 47 So. 18 (1908).

. Amos v. Moseley, 74 Fla. 555, 77 So. 619 (1917).

. Appellate courts have cited materials in the custody of the Florida State Archives as supportive of legislative intent. See State v. Page, 449 So.2d 813, 816 (Fla.1984) (Adkins, J., dissenting). Opinions in such cases rarely indicate how such information came to be considered by the court, but one would suspect it was the result of original appellate research since the court cited repository of the information and not the record of trial proceedings. The inherent problem in reliance on original appellate research in what is essentially an evidentiary quest is that the appellate court does not have the benefit of the adversarial search for and scrutiny of the available information. It therefore appears inappropriate for an appellate court to rely on its own factfinding, without adversarial crosschecks, in determining the legislative intent.