# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D17-505

———————————————

BONITA BRINSON,

    Appellant/Cross-Appellee,

    v.

HOSPITAL HOUSEKEEPING
SERVICES, LLC, and
BROADSPIRE,

    Appellees/Cross-Appellants.

———————————————

On appeal from an order of the Judge of Compensation Claims.
John J. Lazzara, Judge.

Date of Accident: June 29, 2015.

June 22, 2018

OSTERHAUS, J.,

Bonita Brinson failed two illegal-drug tests after falling and injuring her shoulder on the job at the hospital. She later sought workers' compensation benefits, but was denied by her employer-carrier because of the failed tests. *See* § 440.09(3), Fla. Stat. (2017). Ms. Brinson challenged the denial of benefits. But because she failed to rebut the statutory presumption attributing her injury primarily to the influence of drugs, *see* § 440.09(7)(b), we affirm the Judge of Compensation Claims' decision to deny benefits.

I.

Ms. Brinson was working as a housekeeper at a hospital when towards the end of her shift, she fell and dislocated her left shoulder. After the accident, a housekeeping supervisor transported Ms. Brinson to a local medical clinic where she provided a urine sample pursuant to her employer's post-accident, drug-testing policy. She failed the tests by testing positive for the presence of marijuana metabolites on two tests, an immunoassay test and a confirmatory gas chromatography mass spectrometry test.

When the employer hired Ms. Brinson, she signed a stipulation acknowledging the employer's drug testing policy, which said:

> I have been fully advised that if I am injured on the job, regardless of how minor the injury may seem, I am to report that injury to my supervisor. **All employees that are injured are subject to a drug test.**

(Emphasis in original.) She also signed a "Drug Free Awareness" policy at work acknowledging that she "may be asked to provide (if there is reasonable suspicion . . .) body substance samples . . . to determine whether illicit or illegal drugs . . . have been or are being used."

Because of the positive tests, the employer-carrier denied Ms. Brinson's subsequent claim for workers' compensation benefits.

## II.

When an injured employee tests positive for drugs after an accident, like Ms. Brinson did, Florida's workers' compensation law "presume[s] that the injury was occasioned primarily . . . by the influence of the drug upon the employee." § 440.09(7)(b), Fla. Stat. And it does not compensate for the injury. § 440.09(3), Fla. Stat. The law allows the injured employee, however, to rebut the statutory presumption denying compensation by presenting clear and convincing evidence that the "influence of the drug did not contribute to the injury." § 440.09(7)(b), Fla. Stat.

2

Ms. Brinson attempted to rebut the statute's presumption with the testimony of two expert witnesses, but failed to do so. Her strategy didn't include trying to establish an external cause for her injury. She didn't argue, for example, that she'd been tripped by a careless doctor, or pushed by an unruly patient. *See, e.g., Hall v. Recchi Am. Inc.*, 671 So. 2d 197, 201 (Fla. 1st DCA 1996) (finding no relationship between a positive drug test and the workplace accident "because the uncontradicted testimony established that the industrial accident . . . resulted from a co-worker tripping and jabbing him in the back of the head with a screed"). She also didn't argue that the marijuana in her system was merely inactive residue of some fairly recent usage. *Id.* at 199-200 (noting that the JCC found no impairment where a positive drug test resulted from the use of marijuana five days before the workplace accident). Arguments along these lines, if true in her case, might have rebutted the statutory presumption.

Instead, Ms. Brinson's argument for rebutting the statutory presumption focused on attacking the limits of drug testing itself and the Workers' Compensation Act's reliance upon drug testing results. Her two doctor witnesses claimed that the drug tests only detect the presence of drug metabolites, but do not conclusively indicate that drugs are active in the bloodstream or have caused impairment. According to these experts, Ms. Brinson may not have been impaired despite her positive test results. The first doctor, Dr. Goff, testified to having no opinion on whether the drugs in Ms. Brinson's body contributed to her injury. He didn't know whether the positive tests correlated with real-life behavioral effects: "I have no knowledge of the correlation between [the drug test's] cut-off levels and clinical state of effects of the drug on an individual's behavior." According to his testimony, a positive drug test "doesn't tell us if the drug is active [versus inactive] in the bloodstream." The testimony of the second witness, pharmacologist Dr. Lazaridis, was much the same. She testified that the drug tests given to Ms. Brinson measured inactive metabolites, but didn't speak "to whether or not the patient is under the influence." On cross-examination, Dr. Lazaridis said that she could not say that "the levels [Ms.] Brinson had in her drug test were insufficient to cause any [behavioral] effects of marijuana on the date of her accident." She continued: "[T]here are other tests that are more focused on acute intoxication of an individual, [so] I couldn't say

3

that it did [affect her behavior] or I couldn't say that it didn't." In response to another question, Dr. Lazaridis agreed that she could not "say today that [Ms. Brinson] definitely did not smoke on the date of her accident."

Thus Ms. Brinson's witnesses left open the question of whether she was under the influence when the accident occurred. They didn't know whether the drugs in her system contributed to her injury, and so failed to testify effectively for purposes of rebutting § 440.09(7)(b)'s presumption. Because their testimony didn't present clear and convincing evidence that the "influence of the drug did not contribute to the injury," as required by § 440.09(7)(b), Ms. Brinson failed to rebut the presumption.

We acknowledge the dissent's dissatisfaction with the probative limits of drug testing, as well as its up-to-date, drug-testing research.[1] The bottom line here is that Ms. Brinson's witnesses could not say that her drug use did not contribute to her injury. We disagree that an exclusionary rule should be applied with respect to Ms. Brinson's two failed drug tests. She consented to the tests. And the Workers' Compensation Act doesn't forbid employers like this one from drug-testing after a workplace accident. Specifically, Florida law allows employers to drug test employees after an accident whether they operate a proper "drug-free workplace program" or not. *See, e.g.*, *Gustafson's Dairy, Inc./Prof'l Adm'rs. Inc. v. Phillips*, 656 So. 2d 1386, 1387-88 (Fla. 1st DCA 1995) (applying the presumption in favor of an employer who drug-tested an employee after a workplace accident, even

---

[1] We decline to evaluate the dissent's original appellate research for purposes of resolving this case. *See Jacksonville Elec. Auth. v. Dep't of Revenue*, 486 So. 2d 1350, 1354 n.10 (Fla. 1st DCA 1986) ("The inherent problem in reliance on original appellate research in what is essentially an evidentiary quest is that the appellate court does not have the benefit of the adversarial search for and scrutiny of the available information. It therefore appears inappropriate for an appellate court to rely on its own factfinding, without adversarial crosschecks . . . .").

though that employer did not satisfy drug-free workplace program requirements). For employers qualifying as drug-free workplaces, the statute expressly allows "reasonable-suspicion drug testing" on the basis that "an employee has caused, contributed to, or been involved in an accident while at work." *See* § 440.102(1)(n)5., (4)(a)2., Fla. Stat. The freedom to drug-test under these circumstances is no different for non-drug-free workplace employers: "This section . . . does not abrogate the right of an employer under state law to conduct drug tests, or implement employee drug-testing programs." § 440.102(7)(e), Fla. Stat. *See also Laguerre v. Palm Beach Newspapers, Inc.*, 20 So. 3d 392, 394 (4th DCA 2009) ("An employer who elects not to operate a drug-free workplace program . . . is not prohibited from conducting drug testing, as the statute expressly provides.").

Consistent with its statutory prerogative, Ms. Brinson's employment agreement and the employer's drug testing policy established the employer's program allowing it to drug-test Ms. Brinson after the accident. As described earlier, Ms. Brinson's employer had an express and bold-written policy of drug testing "all" injured employees after an accident, which Ms. Brinson accepted. *Cf.,* § 440.102(1)(n)5., (4)(a)2. Fla. Stat. (allowing reasonable-suspicion drug testing on the basis of being "involved in an accident while at work"). Ms. Brinson's testimony demonstrated that she fully understood this policy. She acknowledged that her employer "had a drug free policy" with employees; that she'd been drug-tested in the past when she applied for the job; that she could be drug-tested again in the future; and that she "had no objection" in this case to providing a urine sample after her accident and injury. For these reasons, we don't agree with the dissent's view that the drug testing here was unauthorized or illegal, or that the results of Ms. Brinson's failed drug tests should be excluded.[2]

---

[2] Regarding exclusion, we see no statutory or case-related basis for applying an exclusionary rule on the basis of requiring visible or other signs of impairment in addition to an accident. Test results have long been used in workers' compensation cases (and § 440.09(7)(b)'s presumption has been applied) in the absence of additional impairment evidence. *See, e.g.*, *European Marble Co. v. Robinson*, 885 So. 2d 502, 504-505 (Fla. 1st DCA 2004) (recognizing

## III.

Accordingly, we AFFIRM the order denying benefits for the workplace injury.

LEWIS, J., concurs; MAKAR, J., dissents with opinion.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

MAKAR, J., dissenting.

Near shift's end, Bonita Brinson was cleaning hospital rooms when she slipped and fell, dislocating her shoulder, as she rushed to alert the nurse's station that a patient had coded and was not breathing. Her workplace injury was compensable, but her employer denied coverage after a single two-step urine test—administered by the emergency medical center before it would undertake evaluating her injury—returned positive for inactive marijuana metabolites. She challenges the denial of coverage, arguing that the drug test was unauthorized and, alternatively, that she rebutted the statutory presumption—required for positive drug tests—that that her injury "was occasioned primarily . . . by the influence of the drug upon" her. § 440.09(7)(b), Fla. Stat. (2018).

First, no authority exists for administering the drug test in Brinson's case. By statute, her employer may require a drug test

---

that employers could use properly administered drug-test results from hospital tests conducted for medical purposes after an auto accident); *Temp. Labor Source v. E.H.*, 765 So. 2d 757, 759 (Fla. 1st DCA 2000) (acknowledging that an emergency room drug test in the absence of other employer-originated suspicion could underlie an employer's § 440.09(7)(b)-based defense).

6

of an injured employee only "if the employer has *reason to suspect* that the injury was occasioned primarily . . . by the use of any drug, as defined in this chapter, which affected the employee to the extent that the employee's normal faculties were impaired" as to the accident in question. § 440.09(7)(a), Fla. Stat. (2018) (emphasis added). No evidence exists that the "reason to suspect" requirement was met as to Brinson, who exhibited no signs of impairment at any point prior to or after the workplace accident. Her supervisor testified that Brinson showed no signs of impairment and no evidence suggests that anyone else in the workplace had a suspicion that she might be drug-impaired or that her normal faculties were affected by drug use (only her politesse was questioned).[1]

The employer asserts that all its employees injured in the workplace must be drug tested before they may receive any medical care, which is inconsistent with its written policy that states:

> Using or being under the influence of drugs or alcohol *on the job* may pose serious safety and health risks. To help ensure a safer and healthful working environment, job applicants and team members may be asked to provide (*if there is reasonable suspicion or justifiable cause*) body substance samples (such as urine and/or blood) to determine whether illicit or illegal drugs and/or alcohol have been or are being used.

The emphasized portions, which are consistent with the statutory "reason to suspect" standard, reflect that there must be reasonable suspicion of on-the-job drug-impairment before drug testing is

---

[1] Brinson was a difficult patient. Unclear is whether it was due to her untreated shoulder pain, a gruff personality, or the fact that Brinson's supervisor intervened by personally taking her from the hospital emergency room (where she was awaiting treatment) to a company-authorized medical clinic solely for the drug-testing, which resulted in the immediate denial of any medical treatment.

justified.[2] A workplace injury—without more—is a legally insufficient basis to impose drug testing on an employee under section 440.09(7) or the employer's written policy, both of which require reasonable suspicion, which did not exist as to Brinson. The testing of Brinson was thereby unauthorized under section 440.09(7)(a), negating the employer's reliance on the statutory presumption of intoxication in section 440.09(7)(b) (discussed further below).

Had Brinson's employer adopted a statutorily-defined drug-free workplace program, it would have more latitude to drug test injured employees, perhaps even Brinson. *See* § 440.102, Fla. Stat. (entitled "Drug-free workplace program requirements"). For instance, such employers may impose statutorily-defined "reasonable-suspicion drug testing," which—for purposes of the drug-free workplace program only—"means drug testing based on a belief that an employee is using or has used drugs in violation of the employer's policy drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience." § 440.102(1)(n), Fla. Stat. "Among other things, such facts and inferences may be based upon" six non-exclusive statutory factors, one being information that an employee "has caused, contributed to, *or been involved in an accident while at work*." *Id*. (emphasis added). The highlighted factor gives program-compliant employers leeway to require drug-testing of employees simply because they were "involved" in workplace accidents.

---

[2] Brinson's urine was not given for medical purposes related to her dislocated shoulder, making her situation unlike cases where hospital staff does blood testing for urgent medical reasons associated with immediate treatment of major or catastrophic injuries, which can result in loss of the statutory presumption unless administrative rules on drug-testing policies, procedures, and methods are followed. *See European Marble Co. v. Robinson*, 885 So. 2d 502, 503 (Fla. 1st DCA 2004) (employee "sustained life-threatening injuries to the left side of his head"); *Temp. Labor Source v. E.H.*, 765 So. 2d 757 (Fla. 1st DCA 2000) (catastrophic injury from leg amputation).

But the employer here jettisoned its attempt to establish a drug-free workplace program, which explains why some of its employment documents (such as Brinson's application and the employer's "Drug Free Awareness" policy) required drug testing for *all* workplace accidents, which would be allowable only under section 440.102, Florida Statutes. For this reason, the employer had *no authority* to rely on those documents to test Brinson (absent a "reason to suspect" drug use); nor did it have authority to apply the more flexible standard for "reasonable suspicion drug-testing" in section 440.102(1)(n).[3] Employers cannot take advantage of section 440.102's benefits—including more flexible drug-testing—without first establishing a fully compliant drug-free workplace program; even ones in substantial compliance are ineligible. *See Gustafson's Dairy, Inc./Prof'l Adm'rs, Inc. v. Phillips*, 656 So. 2d 1386, 1388 (Fla. 1st DCA 1995). Doing so gives them an advantage to which they aren't entitled. For like reason, the statutory statement that "[t]his section [establishing requirements for drug-free workplace programs] . . . does not abrogate the right of an employer under state law to conduct drug tests, or implement employee drug-testing programs," does not apply to employers without compliant programs, and thereby has no application in this case. § 440.102(7)(e), Fla. Stat. (2018). Only employers with compliant drug free workplace programs get its benefit.

On this point, no statute or case[4] says that employers subject to Chapter 440, but without drug-free workplace programs, have

---

[3] Nor could it rely on the more stringent evidentiary standard that employees must meet under section 440.09(7)(b)) ("If the employer *has implemented a drug-free workplace*, this presumption may be rebutted only by evidence that there is *no reasonable hypothesis* that the intoxication or drug influence contributed to the injury.") (emphasis added).

[4] For instance, the employee in *Gustafson's Dairy* injured her arm when it got "caught in a machine," resulting in a drug test, which may have been done for medical purposes or, alternatively, was done because there was "reason to suspect" that she was impaired; it might have been done consensually or due to an unchallenged employer policy. The case simply doesn't say. Likewise, the Fourth District's holding in *Laguerre v. Palm Beach*

9

unlimited power to require any type of employee drug-test at any time. The existing legislative framework—which takes away employees' common law rights and replaces them with statutory ones—created a system that balanced employees' rights as to drug testing vis-a-vis rights of employers who need to ensure safe workplaces. This case upsets that balance, giving employers carte blanche to do as they want. An employer without a program, of course, may conduct drug testing under state law, as section 440.09(7)(a) makes clear, but it must comply with standards, such as the "reason to suspect" requirement for drug-testing after a workplace injury. Intermixing the drug-free workplace statute, section 440.102, with the general drug-testing statute, section 440.09(7), creates confusion and thwarts the important legislative protections for drug testing of employees. Plus, why adopt a drug-free workplace program when its more lenient drug-testing standards have now been extended judicially to non-compliant employers?

Second, Brinson—like similarly situated injured employees with inactive metabolites in their system—couldn't have done anything more than she did to rebut the statutory presumption "that the injury was occasioned primarily by the intoxication of, or by the influence of the drug upon, the employee." § 440.09(7)(b), Fla. Stat. Beyond no evidence of impairment or recent drug use and no suspicion of either, Brinson presented unrebutted and supportive expert medical testimony that was fully consistent with the medical literature on marijuana detection and impairment.[5] The JCC found the testimony to be "somewhat speculative," but he failed to explain how, which was error given the scientific testimony was unrefuted and uncontroversial.

---

*Newspapers, Inc.*, 20 So. 3d 392 (Fla. 4th DCA 2009), was that an employee could not pursue a wrongful discharge claim set forth in the drug-free workplace program statute because the employer had not met the program requirements.

[5] *See, e.g.,* U.S. DEP'T OF TRANSP., NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., MARIJUANA-IMPAIRED DRIVING: A REPORT TO CONGRESS 13 (July 2017) [hereinafter MARIJUANA-IMPAIRED DRIVING].

At a minimum, the expert testimony and scientific evidence at trial debunked the widespread misconception that testing positive for marijuana use necessarily correlates with intoxication or influence *at the time of the accident*. To the contrary, as her expert explained, the drug test that Brinson was required to take detects only *inactive* metabolites, the presence of which proves only that the employee—at some indeterminate and potentially distant point in the past—had marijuana in her system; it does not itself prove, or even infer, impairment at the time of the test or the accident. Unlike blood-alcohol tests, which quantify the amount of alcohol present and translate it with scientific precision into predicted levels of impairment and risk, no such test exists for marijuana impairment.[6] In contrast, a test for *active* metabolites— which would have to be done contemporaneously with the alleged injury—has some *potential* of correlating with impairment because active metabolite levels decline by 80-90% within an hour of ingestion; the period of marijuana impairment is almost equally short-lived (typically a few hours thereafter), as Brinson's evidence established.[7]

---

[6] *Id.* at 13. The report notes that studies show that most drivers who smoke marijuana "typically drive slower, follow cars at greater distances, and take fewer risks than when sober. . . . In contrast, subjects dosed with alcohol typically drive faster, follow at closer distances, and take greater risks." *Id.* at 12.

[7] *See also id.* at 5. *See generally What are marijuana effects?*, NAT'L INST. ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/marijuana/what-are-marijuana-effects (last updated Feb. 2018) ("Although detectable amounts of THC [tetrahydrocannabinol] may remain in the body for days or even weeks after use, the noticeable effects of smoked marijuana generally last from 1 to 3 hours, and those of marijuana consumed in food or drink may last for many hours."); AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 516-17 (5th ed. 2013) (DSM-V) ("Cannabis Intoxication") ("Intoxication develops within minutes if the cannabis is smoked but may take a few hours to develop if the cannabis is ingested orally. The effects usually last 3-4 hours, with

The oddity is that a positive test revealing *inactive* metabolites—as here—creates a rebuttable presumption that a workplace "injury was occasioned primarily by the intoxication of, or by the influence of the drug" even though the test has no correlation or predictive power as to whether intoxication, influence, or impairment existed at the time of the injury. And no chemical test for marijuana impairment exists,[8] making it scientifically impossible for employees to directly overcome the premise of the presumption, which is that they were intoxicated or drug-influenced at the time of the accident. They are left with presenting evidence—as did Brinson—that they weren't impaired; had full use of their mental and physical faculties; that the drug test itself proves nothing as to impairment; and that any alleged drug use did not contribute to their injury.[9] In this case, the

the duration being somewhat longer when the substance is ingested orally."). These authoritative materials are consistent with the record evidence and involve matters not in dispute. Unlike thirty years ago, when a panel of our Court felt that researching legislative history on appeal was verboten, *Jacksonville Elec. Auth. v. Dep't of Revenue*, 486 So. 2d 1350, 1354 n.10 (Fla. 1st DCA 1986) ("It therefore appears inappropriate for an appellate court to rely on its own factfinding, without adversarial crosschecks*, in determining the legislative intent.*") (emphasis added), the modern online availability of authoritative sources has enabled the judiciary to become better educated on all manner of topics, which is permissible unless an appellate court has its decision turn on a disputable adjudicative factual finding that is not supported in the record (absent the finding being from an incontestable source, e.g., judicial notice).

[8] MARIJUANA-IMPAIRED DRIVING, at 13.

[9] Expert testimony based on scientific evidence established that it was "highly unlikely" that Brinson's alleged drug use would have contributed to her injury. If Brinson's evidentiary burden is—as the "bottom line" of this case establishes—that her witnesses must say with certainty that "her [alleged] drug use did not contribute to her injury," the statutory presumption becomes irrebuttable and thereby unconstitutional. *Recchi Am. Inc. v. Hall,*

12

evidence in support of Brinson was entirely one-sided, easily overcoming the statutory presumption, entitling her to relief.

All this said, marijuana intoxication is a serious matter of public health and a workplace safety concern that employers face daily.[10] The confluence of lawful marijuana use (medical in Florida, medical/recreational elsewhere),[11] the lack of scientific standards or chemical tests for marijuana impairment, and the interplay of federal enforcement policy make the future application of workplace drug tests challenging, to say the least.[12]

---

Paul M. Anderson of Anderson & Hart, P.A., Tallahassee, for Appellant/Cross-Appellee.

---

692 So. 2d 153 (Fla. 1997) (section 440.09(3)'s then-existing conclusive presumption that injury in drug-free workplace was caused by claimant's intoxication due to positive drug test violates due process), *affirming*, *Hall v. Recchi Am. Inc.*, 671 So. 2d 197 (Fla. 1st DCA 1996).

[10] DSM-V, at 517 ("Functional Consequences of Cannabis Intoxication") ("Impairment from cannabis intoxication may have serious consequences, including dysfunction at work or school, social indiscretions, failure to fulfill role obligations, traffic accidents, and having unprotected sex. In rare cases, cannabis intoxication may precipitate a psychosis that may vary in duration.").

[11] *See State Marijuana Laws in 2018 Map,* GOVERNING*, http://www.governing.com/gov-data/state-marijuana-laws-map-medical-recreational.html* (last visited May 10, 2018).

[12] *See generally* Stacy A. Hickox, *Drug Testing of Medical Marijuana Users in the Workplace: An Inaccurate Test of Impairment*, 29 HOFSTRA LAB. & EMP. L.J. 273, 335 (2012) (surveying the medical and legal issues related to medical marijuana users in the workforce).

Gwen G. Jacobs of Bennett, Jacobs & Adams, P.A., Tampa, for Appellees/Cross-Appellants.